

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| COLTON and CHERYL BEHR, | ) | |
| | ) | No.  36222-1-III |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DR. CHRISTOPHER G. ANDERSON, | ) | OPINION PUBLISHED IN PART |
| DR. TIMOTHY W. POWERS, LEANN | ) | |
| G. BACH, PAC, DR. PATRICK S. | ) | |
| LYNCH, JR., NORTHWEST | ) | |
| ORTHOPEDIC SPECIALISTS, AND | ) | |
| DEACONESS HOSPITAL, | ) | |
| | ) | |
| Respondents. | ) | |

SIDDOWAY, A.C.J. — After fracturing his tibia, Colton Behr underwent surgery at Deaconess Hospital in Spokane.  Postsurgery, he experienced compartment syndrome, an unusual but foreseeable complication.  By the time it was recognized, the tissue necrosis was so extensive that most of the muscle of the anterior compartment of his leg had to be removed.

Mr. Behr and his wife sued the hospital, Northwest Orthopedic Specialists, and four Northwest Orthopedic employees, alleging medical malpractice in Mr. Behr's

postoperative care. Their claims against two of Northwest Orthopedic's surgeons were dismissed on summary judgment.

At trial, the Behrs' claim against Deaconess and its claim against Northwest Orthopedic for alleged malpractice by its physician assistant (PA) were dismissed as a matter of law at the close of the Behrs' case. Their remaining claim against Northwest Orthopedic, for the alleged malpractice of Dr. Christopher Anderson, resulted in a defense verdict. The Behrs challenge all the dismissals as well as discovery, evidentiary, instructional, and procedural rulings.

In the published portion of this opinion, we hold first, that the trial court misapplied the "sham affidavit," or "*Marshall*"[1] rule, when it refused to consider an expert's declaration filed in opposition to the two surgeons' motions for summary judgment. We also conclude that the trial court abused its discretion when it sustained objections to an orthopedic physician's testimony to the standard of care owed by a physician assistant and, on that basis, granted partial judgment as a matter of law in favor of Northwest Orthopedic.

In the unpublished portion of the opinion, we reject the Behrs' challenges to judgment as a matter of law in favor of the hospital and the jury's verdict in favor of Northwest Orthopedic on the narrowed claim alleging medical negligence by Dr. Anderson.

---

[1] *Marshall v. AC&S Inc.*, 56 Wn. App. 181, 185, 782 P.2d 1107 (1989).

We reverse the summary judgment dismissal of claims against two orthopedic surgeons and reverse dismissal of the claim against Northwest Orthopedic that was predicated on its physician assistant's alleged acts and omissions. The case is remanded for further proceedings.

FACTS

Compartment syndrome occurs when some condition causes a compartment in the body to expand or swell, creating pressure that can cut off blood supply leading to destruction of the contents (muscle and nerve) in the compartment. When suspected, it is treated by immediately performing a fasciotomy, which is an incision that relieves the pressure. Symptoms that compartment syndrome is occurring include pain out of proportion to the injury/surgery, paresthesia (tingling or burning), swelling, turgor (tenseness), and pulselessness. If compartment syndrome is suspected, a needle attached to a pressure monitor can be used to confirm the diagnosis.

The following facts leading up to the fasciotomy performed to address Colton Behr's compartment syndrome, some disputed, had come to light by the time of the trial below. As explained when we turn to the procedural history, not all were permitted to be presented at trial.

Thirty-nine-year-old Colton Behr injured his left leg playing basketball in Priest Lake, Idaho, on Wednesday, December 8, 2010. He drove himself to the emergency room at Deaconess Hospital in Spokane, where emergency room personnel diagnosed

3

him with a left tibial plateau fracture. He was admitted to the hospital at around 10:00 p.m. Patrick Lynch, an employee of Northwest Orthopedic and the on-call orthopedic surgeon, examined Mr. Behr, confirmed the diagnosis, and recommended surgery.

Dr. Timothy Powers, one of Dr. Lynch's colleagues at Northwest Orthopedic, performed the surgery late in the day on Thursday, December 9. He saw Mr. Behr after the surgery, on Thursday night, and it appeared Mr. Behr was doing well.

There is conflicting evidence whether Mr. Behr experienced pain that was out of proportion to his injury and surgery beginning on Friday, December 10. Mr. Behr, a friend who visited him in the hospital, and Mr. Behr's wife Cheryl, testified during proceedings below that he was observably in pain and uncharacteristically anxious and irritable, from shortly after the surgery until relief was delivered by the fasciotomy. In addition to their testimony, the Behrs offered as evidence medical record entries that he frequently complained of pain, he was anxious (and was treated for anxiety) because he thought there was something wrong, and he questioned whether his nurses and Northwest Orthopedic's physician assistants knew what they were doing. He asked multiple times to be seen by a doctor. The Behrs also pointed to evidence of the amount of pain medication he was given.

In support of their position that Mr. Behr was not experiencing disproportionate pain, the defendant medical providers pointed to the fact that Deaconess nursing staff and Northwest Orthopedic providers regularly asked Mr. Behr to rate his level of pain on a 1-

to-10 scale and he never rated it above 6. They argue that he responded to the pain medication being administered, as reflected in medical chart notes that reflect him reporting pain levels as low as 2 and that he was comfortable. Defense providers and other experts testified that patients undergoing surgery for a long bone fracture typically experience extreme pain.

Turning from evidence of Mr. Behr's pain history to other postsurgical events, it is undisputed that after being seen postoperatively by Dr. Powers, Mr. Behr's next visit by a Northwest Orthopedic employee was when he was seen sometime before 9:30 the following morning (Friday) by Mark Buescher, a PA.[2] PA Buescher noted on the medical chart that Mr. Behr was neurovascularly intact and able to wiggle his toes.

Late in the morning on Friday, a Deaconess physical therapist (PT), Ruth Benage, spent time working with Mr. Behr. Mr. Behr needed a physical therapist's clearance before he could be discharged. PT Benage's notes to the chart state, "Of note, significant edema" in Mr. Behr's left foot. Report of Proceedings (RP) at 506. She further noted "dec[reased] sensation" and "no active [dorsiflexion[3]] noted or toe movements." Clerk's Papers (CP) at 288 (capitalization omitted). Her note states she had discussed Mr. Behr's

---

[2] Both PAs treating Mr. Behr were certified, as is generally required for anything other than interim licensing as a physician assistant in Washington. *See* RCW 18.71A.020(1); WAC 246-918-005(7), -080. While the parties' briefing refers to them as PA-Cs, we conform to our usual practice of referring only to a professional's licensing.

[3] Pointing the toes up, toward the nose.

foot status "with RN[4] Jennifer [Lail] and I will call Dr. Lynch regarding status." *Id.*

(some capitalization omitted). She concluded her note with her plan, including "call Dr.

Lynch to make him aware of l[eft] foot status with dec[reased] active movement and

dec[reased] sensation/edema." *Id.* (some capitalization omitted).

Northwest Orthopedic records reveal that PT Benage called its office at 12:55 p.m.

that day. She left a message that its employee, Deneen Tate, took down as follows:

> Ruth from Deaconess PT called to report that Colten [sic] is unable to
> perform any active movement of his left foot. He has lots of edema and
> decreased sensation in that foot.

CP at 3711. Ms. Tate forwarded the message via e-mail to Dr. Lynch. Dr. Lynch

believed it was misdirected to him, and forwarded it to Dr. Powers. According to Dr.

Lynch, he would "[t]ypically just pass [a misdirected message] on to the proper person"

without looking at its contents. RP at 564-65. Both Dr. Lynch and Dr. Powers deny

having read the note and neither acted on it.

Mr. Behr was next seen by a Northwest Orthopedic employee the following day,

Saturday, December 11, when PA Leann Bach handled rounds at Deaconess. She was

not aware of the phone message left by PT Benage the day before. She arrived at Mr.

Behr's room at 10:45 a.m. She could not recall at the time of trial whether she reviewed

the notes of PT Benage's evaluation.

---

[4] Registered nurse.

PA Bach noted that Mr. Behr "reports persistent pain" and that "nursing reports patient has had 16 Norco[5] in past 24 hrs." CP at 2657. On removing the dressing from his knee, she observed edema around his kneecap. She suspected that hemarthrosis (blood in the joint with edema) might be the source of his pain. After speaking with and obtaining approval from Dr. Anderson, the Northwest Orthopedic surgeon on call on Saturday, December 11, she used a large-bore needle in two attempts to aspirate Mr. Behr's parapatellar space. The attempts were unsuccessful. They were quite painful, according to Mr. Behr. PA Bach then fitted Mr. Behr with a polar ice machine.

Kristy Waller, the charge nurse on the Deaconess orthopedic floor became involved in Mr. Behr's care on Saturday, after nurse Lail felt Mr. Behr treated her "rude[ly] and condescending[ly] . . . all morning." CP at 2834. Limited practice nurse (LPN) Lail's notes indicate that she assisted PA Bach with the attempted aspiration and that the lack of blood return "made [patient] very upset and demanded to see a doctor instead of PA again." CP at 2834.

RN Waller assigned a new nurse to Mr. Behr, and assured Mr. Behr she would call Dr. Anderson, which she did. Dr. Anderson visited Mr. Behr at 3:00 p.m. Saturday afternoon. Ms. Behr contends that Dr. Anderson's visit to her husband lasted no more than 10 minutes and that he conducted a very limited examination. Dr. Anderson

---

[5] A medication containing an opioid pain reliever (hydrocodone) and a nonopioid pain reliever (acetaminophen).

contends that he examined Mr. Behr's leg and then spent more than 30 minutes talking to him, for a total visit of 40 to 45 minutes. Dr. Anderson noted on Mr. Behr's chart, "No s[ymptoms] of compartment syndrome[. P]lan[:] continue to monitor." CP at 279.

On Sunday, December 12, Dr. Anderson visited Mr. Behr during his rounds. He arrived at 11:00 a.m., and observed signs of compartment syndrome that he noted were not present the day before. The Behrs insist that Mr. Behr's condition was unchanged from the prior afternoon. Dr. Anderson measured Mr. Behr's compartment pressure at 11:30 a.m. He recorded the measurements as "clinical & objective evidence of compartment syndrome" and ordered Mr. Behr "to OR ASAP." CP at 280. Mr. Behr was taken to the operating room at 12:06 p.m. and the fasciotomy surgery began at 12:24 p.m.

Mr. Behr was discharged from Deaconess the next day, Monday, December 13. Dr. Powers' discharge notes indicate that following the fasciotomy, Mr. Behr was "unable to substantially dorsiflex his ankle, although there is a flicker of dorsiflexion in his toes throughout." CP at 317. His notes express Dr. Powers's "hope that [Mr. Behr's] seeming neurapraxia of the deep peroneal nerve will slowly resolve over some time." *Id*. It turned out, however, that by the time the fasciotomy was performed, Mr. Behr's tissue was compromised beyond repair. Mr. Behr underwent multiple surgeries to remove the necrotic tissue, tendons, and muscles of his anterior compartment, leaving Mr. Behr, a home builder and previously active recreationalist, unable to lift his left foot.

PROCEDURE

Mr. Behr and his wife filed a medical malpractice action in December 2012 against Drs. Lynch, Powers, and Anderson; PA Bach; Northwest Orthopedic Specialists; and Deaconess Hospital. In December 2013, the Behrs disclosed as expert witnesses Andrew Collier, M.D., an orthopedic surgeon, and Linda Newman, an RN.

*Dr. Collier is deposed and Drs. Lynch and Powers successfully move for summary judgment*

Dr. Collier was deposed by the defendants on January 29, 2014. At the time of Dr. Collier's deposition, the Behrs had no evidence that PT Benage ever followed through on her plan to report concerns about Mr. Behr to Dr. Lynch. The Behrs would not receive Northwest Orthopedic's record of her telephone message sent to Dr. Lynch, and then to Dr. Powers, until early 2018.

When deposed, Dr. Collier was asked whether he had an opinion that Drs. Lynch and Powers had or had not violated the standard of care. He gave the following testimony:

Q.   Who do you understand Dr. Lynch to be?
A.   *I don't know who Dr. Lynch is. I believe he's maybe one of Dr. Powers' partners.*
Q.   Do you have any criticisms of Dr. Lynch in this case?
A.   No sir. *I think he just saw the patient one time.*
. . . .

9

> Q.      Before I ask you what your opinions are, do you have any opinions of Dr. Powers that anything he did or didn't do violated the standard of care?
>
> A.      No.  *He did appropriate treatment and care for the tibial plateau fracture.  He, I assume, was off for the weekend.  So he did not follow the patient or see him.*
>
> Q.      I think I've asked you this, but I want to make sure.  Do you have any opinions regarding Dr. Lynch, that he did anything or didn't do anything that violated the standard of care in this case?
>
> A.      No, sir.

CP at 140-41 (emphasis added).  In response to concluding questions, Dr. Collier reiterated that he had expressed the opinions he had reached in the case.  He testified that he did not intend to add any additional criticisms beyond those identified.

Two days after Dr. Collier's deposition and before a draft transcript of his deposition was prepared, Dr. Powers and Dr. Lynch each moved for summary judgment. They relied on their own declarations that they conformed to the standard of care. Lacking a transcript of Dr. Collier's deposition, their motions relied on their lawyers' representations that the Behrs had no expert who would testify they had deviated from the standard of care.

The doctors' original and supplemental declarations in support of their motions for summary judgment described their limited roles in Mr. Behr's care.  Dr. Lynch testified that his care of Mr. Behr was limited to admitting him to the hospital and giving Mr. Behr the option of having surgery performed earlier by Dr. Powers or later by Dr. Lynch.  He

testified in a supplemental declaration that once Mr. Behr decided to undergo surgery by

Dr. Powers on December 9, Dr. Powers was his attending physician.

Dr. Powers testified that his involvement in Mr. Behr's care was limited to

performing the surgery on Thursday, December 9, discharging Mr. Behr from the

hospital on December 13, and transferring Mr. Behr's care to an orthopedic surgeon in

Mr. Behr's home state of Montana. He testified that after seeing Mr. Behr

postoperatively on December 9,

> I was not subsequently aware of any information that indicated a need to
> implement additional activity beyond having him seen once daily by an
> orthopedic surgeon or physician's assistant (PA). I was out of town in
> Northern Idaho from early Friday morning, December 10, 2010, through
> the afternoon of Sunday, December 12, 2010. The next contact I had
> concerning Colton Behr occurred on the evening of Sunday, December 12,
> 2010, when Dr. Christopher Anderson contacted me regarding the
> fasciotomy that had already been performed.

CP at 3791. Neither doctor's declaration said anything about PT Benage's message of

Friday, December 10.

Once a draft transcript of Dr. Collier's deposition became available, Dr. Lynch

submitted excerpts as supplemental support for the motions for summary judgment.

Even before responding to the summary judgment motions, the Behrs moved to strike the

deposition excerpts, pointing out that Dr. Collier had not yet received a transcript of his

deposition, and the 30 days within which he was permitted by CR 30(e) to make changes

had not passed.

11

The Behrs also moved to compel more complete answers to written discovery they had served on Drs. Lynch and Powers, and moved under CR 56(f) to continue the summary judgment hearing for that purpose. Among answers they complained were insufficient were the physicians' answers to an interrogatory asking for an identification of which Northwest Orthopedic provider was assigned responsibility for Mr. Behr's care at different times. It asked:

> INTERROGATORY NO. 39: Who was the physician or physician's assistant assigned to Colton Behr's care from the time of his admission on 12/8/10 through to his discharge? Please provide an exact account of who was responsible each period of time, at least to the hour, for that care.

CP at 207.

> Dr. Lynch had answered:

> ANSWER: Objection. Defendant is not obligated to perform an investigation at counsel's demand in response to Interrogatory No. 39.

CP at 208 (boldface omitted).

> Dr. Powers had answered:

> Answer to Interrogatory No. 39:
> [Objection omitted.]
> Without waiving objection, there is shared responsibility with patient care, and Dr. Powers is therefore not able to answer the interrogatory as presently stated.

CP at 321 (boldface omitted). While the Behrs embraced Dr. Powers's statement about a "shared responsibility with patient care," they argued that by refusing to identify periods of individual provider's responsibility, he should be precluded from avoiding

responsibility for any period of time in which Mr. Behr suffered deficient care. CP at 197.

A few days after moving to compel discovery and for a CR 56(f) continuance, the Behrs filed their materials in opposition to the summary judgment motions. They principally relied on a declaration from Dr. Collier in which he expressed the opinion that Mr. Behr's postoperative pain and anxiety should have decreased after surgery, and the fact that they did not were "key warning signs of compartment syndrome." CP at 326. He expressed the opinion that Mr. Behr had "full-blown compartment syndrome" by noon on December 10. *Id.* The Behrs also relied on Dr. Powers's discovery response that the Northwest Orthopedic physicians and physician assistants had a shared responsibility for patient care.

Dr. Collier testified in his declaration that while he had no "specific criticisms of Dr. Powers or Dr. Lynch regarding the individual pieces of care they did provide, . . . I do criticize the omissions of care suffered by Colton Behr." CP at 325. He testified that "[a]ll the physicians, and their physician's assistants, have the duty of care to assure proper follow-up care," a duty he testified "was violated, leading to Colton Behr's compartment syndrome." *Id.* He testified the duty was violated by failing to "review[ ] notes and medical records," and specifically failing to "notice[ ] the physical therapist's note of 12:21 on 12/10/10," by failing to "make sure that Mr. Behr received proper post-operative care," and by failing "to properly monitor Colton Behr." CP at 326, 328, 331.

13

At a couple of points in his declaration, Dr. Collier stated that it served as a "correction[ ]" or "clarif[ication]" of his deposition testimony. CP at 323, 325.

Separately, and within 30 days of Dr. Collier's receipt of the transcript, he executed two purported forms of CR 30(e) corrections: a three-page errata sheet and an 11-page "CR 30(e) Supplemental Deposition Corrections" document. CP at 526-41. The CR 30(e) Supplemental Deposition Corrections document stated that "[a]s part of being asked questions about specific, piecemeal, performances, of individual actors, for examples Dr. Powers, Dr. Lynch, and PA Bach, at times I did say that those individual, specific, performances, were not below the standard of care." CP at 535. He again stated, however, that the physicians had violated a collective responsibility to follow up postsurgically with Mr. Behr. Dr. Collier pointed to testimony he gave at pages 35-36 of his deposition as evidence that he consistently viewed the problem as not "the care," but the "non-care." CP at 538.

The defendants moved to strike Dr. Collier's declaration as a sham affidavit that contradicted his deposition testimony and could not be used to create an issue of material fact. They also argued that an aggregated theory of liability against a practice group failed as a matter of law, relying on *Grove v. PeaceHealth Saint Joseph Hospital*, 177 Wn. App. 370, 312 P.3d 66 (2013) (*Grove* I), a then-recent decision by this court holding that in a medical malpractice action a plaintiff must prove a violation of the standard of care by a particular health care provider.

The trial court granted Drs. Lynch's and Powers's motions to strike Dr. Collier's declaration as inconsistent with his uncorrected deposition testimony under the sham affidavit rule adopted in *Marshall*. Having struck the declaration, the trial court granted Dr. Powers's and Dr. Lynch's motions for summary judgment on the basis that "[p]laintiffs have not shown sufficient evidence that there was a violation of the standard of care," and dismissed the claims against them with prejudice. CP at 805. In announcing its ruling orally, the trial court added that if it were to consider Dr. Collier's newly-expressed opinion of a collective responsibility to review records and monitor, it would still grant summary judgment dismissal on the basis of *Grove* I.

The Behrs sought and were denied interlocutory review of the trial court's decisions.

*Plaintiffs' first motion to reinstate Drs. Lynch and Powers as defendants*

In December 2014, the Washington Supreme Court reversed this court's decision in *Grove* I. *See Grove v. PeaceHealth St. Joseph Hosp.*, 182 Wn.2d 136, 341 P.3d 261 (2014) (*Grove* II). It held that the plaintiff in that case had presented sufficient evidence of a failure to monitor for the known potential complication of compartment syndrome. *Id.* at 145. It further held that there was no failure by the plaintiff to link the alleged breach of the standard of care to an individual provider because for each provider the plaintiff's expert testified was responsible, the provider's standard of care had been established by expert testimony. *Id.* at 146-47.

15

A couple of months later, the Behrs moved to reinstate Drs. Lynch and Powers as defendants under a team liability theory they argued now had the imprimatur of the high court. The doctors opposed the motion, arguing that, if team liability could be proved, then Northwest Orthopedics, not them, would be the liable party. Dr. Lynch also pointed out that this court's decision in *Grove* I was only one basis on which the trial court granted summary judgment.

The motion was heard by a second trial judge. The court denied the motion on the basis that summary judgment had been granted based on exclusion of Dr. Collier's declaration as a sham affidavit and the Behrs' inability to prove a violation of the standard of care by the surgeons. The Behrs unsuccessfully moved for reconsideration and for interlocutory review.

*Late discovery and the second motion to reinstate Drs. Lynch and Powers as defendants*

An amended case schedule order set a January 2018 trial date. In December 2017, the Behrs—complaining that Northwest Orthopedic and PA Bach never answered written discovery served in 2014—moved for an order excluding any evidence offered by them that would have been responsive to the unanswered discovery.

Northwest Orthopedic and PA Bach quickly served responses to the discovery, which they supplemented in January 2018. In opposing the Behrs' motion they submitted a declaration from one of their lawyers, who testified that when his firm was substituted

as counsel for Northwest Orthopedic and PA Bach in February 2017, the files it received did not contain the unanswered discovery. He testified that to his knowledge, no one at his firm was aware that discovery had gone unanswered until the motion to exclude evidence was served.

By the time the Behrs' motion to exclude the defense evidence was heard, the trial court had continued trial to May 2018. It denied the motion but granted leave to the Behrs "to conduct further discovery only as to recently disclosed facts, documents, experts, or opinions of Northwest Orthopedics or Leann G. Bach." CP at 3681.

Among documents produced by Northwest Orthopedic for the first time in January 2018 was its record of the telephone message that PT Benage left for Dr. Lynch on Friday, December 10. Also answered completely for the first time was its position on who had been on call on December 10. Like Drs. Lynch and Powers, Northwest Orthopedic had received the Behrs' interrogatory 39, asking which physician or physician assistant was assigned responsibility for Mr. Behr's care for "each period of time" during his hospitalization. In its supplemental sworn answer served in January 2018, Northwest Orthopedic stated, in relevant part:

> Dr. Powers performed the surgery on Colton Behr on December 10, 2010 and was the on-call physician until he left town that day. On December 10, 2010, PA Mark Buescher examined Colton Behr. Dr. Lynch was the on-call physician after Dr. Powers left town.

17

CP at 4703.[6]

Dr. Lynch disputed this answer and filed a declaration in which he testified, "I was not the on call surgeon for Northwest Orthopedic Specialists for hospitalized patients at Deaconess Medical Center on December 10, 2010." CP at 3867. But the Behrs deposed Jon Braun, Northwest Orthopedic's chief executive officer, who signed the supplemental discovery response. He testified that he arrived at his answer to interrogatory 39 through discussions with Dr. Lynch and Dr. Powers during the time he was forming the answers. No evidence was offered that a physician *other than* Dr. Lynch or Dr. Powers was on call on December 10.

Based on the information that Dr. Lynch or Dr. Powers had been on call on December 10, that both received the telephone message from PT Benage, and that neither took any action, the Behrs moved a second time for an order reinstating Dr. Lynch, and later Dr. Powers, as individual defendants. A third trial judge, to which the case was now assigned for trial, again denied the motion. In ruling orally, the court stated:

> I'm not sure that it changes anything because Dr. Lynch is still saying, "I didn't take the calls." That is an issue for trial. Dr. Lynch can still be a trial witness. I think he's on a witness list, if I'm not mistaken. I don't know that for sure. But under the circumstances, I do not think this rises to level, based upon what is coming through and being discovered, as a basis for reinstating Dr. Lynch. I am not going to be reinstating him as a defendant. Trial will go forward.

---

[6] As earlier recounted, the surgery was performed late in the day on December 9, not December 10. December 10 *was* the day on which Dr. Powers left town.

18

RP at 34. In its oral ruling denying the Behrs' motion to reinstate Dr. Powers, the trial

court stated:

> The issue before the Court is whether to reinstate, then, Dr. Powers. Most of what I was reading in Plaintiffs' brief go back to Dr. Lynch being a liar; therefore, I should call this new information and reinstate. . . .
>    . . . .
> So now the plaintiff is saying it is new stuff that could never have been discovered before, and I cannot make that finding as I sit here today. I don't know that it couldn't have been found before. . . .

RP at 55-56. The court also denied the Behrs' motion to continue trial in order to depose

Deaconess employees.

*Pretrial in limine rulings and the Behrs' voluntary dismissal of claims against Dr. Anderson and PA Bach*

About a month before trial, the Behrs filed a submission in which they stated an

intention that at the time of trial RN Newman "may now present causation testimony,

under recent case law, *Frausto v. Yakima HMA, LLC*, 188 W[n].2d 227, 243, 393 P.3d

776 (2017), if she is shown to have the necessary experience and background under ER

702." CP at 4398. When earlier deposed, RN Newman had testified that she was not

asked to render opinions on causation.

Deaconess filed a pretrial motion in limine seeking to prohibit RN Newman from

offering causation opinions, arguing it would be prejudiced by the late disclosure. It also

argued that *Frausto*, which addressed the ability of an advanced registered nurse

practitioner (ARNP) to provide the necessary evidence of proximate causation, did not

19

apply, since nurse Newman was only an RN.  The trial court applied the *Burnet*[7] factors

and granted the motion.

Dr. Anderson's pretrial motions in limine included two that sought to exclude Dr.

Collier's late-expressed criticisms of violations of the standard of care by Dr. Lynch and

Dr. Powers.  They relied for their motions on Dr. Collier's conflicting deposition

testimony and the order granting summary judgment.  The trial court granted the motions

in limine, preventing the Behrs from offering evidence of fault on the part of Dr. Lynch

or Dr. Powers on Friday, December 10.

On the eve of trial, the Behrs voluntarily dismissed their claims against Dr.

Anderson and PA Bach individually, choosing to proceed to trial against only Northwest

Orthopedic and Deaconess.  They explained "it would be confusing to the jury" if Dr.

Anderson and PA Bach were parties and Drs. Lynch and Powers were not, and that the

dismissal would "make the trial manageable given the time constraints."  RP at 149-50.

*Trial*

The parties proceeded to a 2½ week trial in May 2018.  Among other witnesses,

the Behrs called PT Benage as a witness.  They were unrestricted in their presentation of

evidence of her observations on Friday, December 10, and the fact that she left a message

about her concerns with Northwest Orthopedic.

---

[7] *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997).

During trial, the Behrs attempted to question Dr. Collier about the standard of care owed by PA Bach. Asked by the Behrs' lawyer if he was familiar with the standard of care for physician assistants, he answered, "Yes, sir, to a certain extent"; asked to explain what that meant, he testified, "Meaning I don't use physician's assistants; I have residents. I do know what they do. They are physician extenders, but I personally don't use them." RP at 726. When an objection to a lack of foundation was sustained, the Behrs elicited Dr. Collier's testimony that he works with physicians who use physician assistants; is familiar with the PAs' relationship to their supervising orthopedic surgeons; has seen PAs work in operating rooms, on the floors, and in evaluating patients; and has spoken with colleagues about their PAs' scope of authority. The trial court consistently sustained objections to the foundation for Dr. Collier's opinion on an orthopedic PA's standard of care. No opinion was ever expressed.

At the conclusion of the Behrs' case, Deaconess moved for judgment as a matter of law. Northwest Orthopedic moved for judgment as a matter of law in part, for any liability on account of acts or omissions by PA Bach. The trial court granted Deaconess's motion on the basis that the Behrs failed to present necessary expert testimony that nursing standard of care violations were the proximate cause of Mr. Behr's injuries. It granted Northwest Orthopedic's motion on the basis that the Behrs presented no expert testimony that PA Bach did or failed to do anything that violated the standard of care. The result was that the only malpractice claim that would be decided by the jury was the

21

malpractice claim against Northwest Orthopedic, for alleged acts or omissions of Dr. Anderson.

In the defense case, Dr. Anderson testified that when he visited Mr. Behr on December 11, he determined from his examination that Mr. Behr did not have compartment syndrome, so there was no reason to perform a compartment pressure test at that time. He testified that when he made rounds on December 12, and had a clinical basis for suspecting compartment syndrome, he immediately tested Mr. Behr's compartment pressure and based on the results, immediately performed a fasciotomy.

At the conclusion of the evidence, the trial court held an instructions conference at which it invited any objections or exceptions to its proposed jury instructions. Asked whether there were any objections to what became the court's instruction 12, a discretionary "exercise of judgment" pattern instruction,[8] the Behrs objected on the basis that "this is really not a competing diagnoses case." RP at 1748. They cited *Fergen v. Sestero*, in which a four-member minority of our Supreme Court would have "jettison[ed]" the pattern instruction, which it characterized as argumentative and

---

[8] The instruction stated:

An orthopedic surgeon is not liable for selecting one of two or more alternative diagnoses, if, in arriving at the judgment to follow the particular diagnoses, the orthopedic surgeon exercised reasonable care and skill within the standard of care the orthopedic surgeon was obliged to follow.

CP at 6590; *see* 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL § 105.08, at 625 (7th ed. 2019).

confusing. 182 Wn.2d 794, 813, 346 P.3d 708 (2015) (Stephens, J., dissenting).

Northwest Orthopedic argued that a competing diagnosis issue was presented by Dr.

Anderson's examination on December 11, when he had to assess whether pain and

swelling being experienced by Mr. Behr was postoperative pain and swelling or signs of

compartment syndrome. The trial court overruled the Behrs' objection and gave the

instruction.

Asked for exceptions to instructions not given, the Behrs identified only their

instructions P-10 and P-12, stating that "the rest of the plaintiffs' proposed instructions

have already been dispatched by prior rulings of the court." RP at 1768.

The jury returned a defense verdict, by a 10-2 vote. Posttrial motions by the Behrs

for reconsideration and for a new trial were denied. The Behrs appeal.

## ANALYSIS

The Behrs make 10 distinct assignments of error on appeal.[9] We begin with their

assignments of error (i) to the April 2014 order granting summary judgment dismissal of

the Behrs' claims against Dr. Lynch and Dr. Powers and the 2015 and 2018 decisions

refusing to reinstate the claims (Assignments of Error 1 and 2), and (ii) to sustaining

---

[9] An 11th assignment of error contends that the Behrs' other assigned errors provide a basis for concluding that the trial court erred by not continuing trial or ordering a new trial on an amended complaint. The 11th assignment is unsupported by further argument and will not be separately addressed. *See* RAP 10.3(a)(6).

objections to Dr. Collier testifying to the standard of care of a physician assistant

(Assignment of Error 6).

I.     THE TRIAL COURT ERRED IN DISMISSING THE CLAIMS AGAINST DRS. LYNCH AND
       POWERS; WE NEED NOT REACH THE CLAIMED ERROR IN FAILING TO REINSTATE
       THOSE CLAIMS

In Washington, plaintiffs in a medical malpractice action must prove two key

elements: (1) that the defendant health care provider failed to exercise the standard of

care of a reasonably prudent health care provider in that same profession, and (2) that

such failure was a proximate cause of the plaintiff's injuries.  RCW 7.70.040; *Frausto*,

188 Wn.2d at 231.  Expert testimony is generally necessary to establish the standard of

care and proximate cause.  *Id.*at 231-32.  Defendant health care providers commonly

move for summary judgment dismissal of a medical malpractice claim when a plaintiff

lacks the necessary evidence of breach and causation.  "[A] defendant moving for

summary judgment can meet its initial burden by showing that the plaintiff lacks

competent expert testimony."  *Guile v. Ballard Cmty. Hosp.*, 70 Wn. App. 18, 25, 851

P.2d 689 (1993).  "The burden then shifts to the plaintiff to produce an affidavit from a

qualified expert witness that alleges specific facts establishing a cause of action."  *Id*.

This court reviews a summary judgment ruling de novo.  *Frausto*, 188 Wn.2d at 231.

Dr. Collier's belated disclosure of opinions he was asked about but failed to

disclose when deposed unquestionably inconvenienced defense counsel.  It had already

created the expense for Drs. Lynch and Powers of moving for summary judgment and

would cause them to incur further discovery expense. The inconsistency and belated disclosure was a basis for a discovery sanction against the Behrs, and it left Dr. Collier open to impeachment at trial. The question presented on appeal is whether it was a basis for imposing the narrow and more extreme remedy of having Dr. Collier's declaration in opposition to summary judgment treated as a sham.

In deciding whether a genuine issue of material fact prevents summary judgment, Washington follows the "sham affidavit" or "sham issue of fact" doctrine that originated in federal courts applying Federal Rule of Civil Procedure 56. The doctrine holds that when a party has given clear answers to unambiguous deposition questions that negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, the previously given, clear testimony. *Sluman v. State*, 3 Wn. App. 2d 656, 697, 418 P.3d 125 (2018). This court often refers to the doctrine as "the *Marshall* rule," because it was first applied in our courts in the 1989 decision in *Marshall*. But the *Marshall* court relied exclusively on three federal cases dating back to 1975, *see* 56 Wn. App. at 185, and federal law can inform the rule's application. Although the rule is typically applied where a *party* submits an affidavit that contradicts the party's own prior statements, it may also apply when a party attempts to use evidence from an expert to defeat summary judgment. *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (citing *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 736 (2d Cir.

25

2010)). Whether an opposition affidavit is a sham that cannot create a genuine issue of fact is a summary judgment issue we review de novo. *Frausto*, 188 Wn.2d at 231 (citing *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998)) (applying de novo standard of review to all trial court rulings made in conjunction with a summary judgment motion).

The sham affidavit rule is a narrow one, in that the challenged affidavit must directly contradict the affiant's unambiguous sworn testimony previously given. And if the later affidavit offers an explanation for the previously given testimony, the trier of fact, not the court, should determine the plausibility of the explanation. *Sluman*, 3 Wn. App. 2d at 697-98. The affiant will be subject to impeachment with the inconsistent deposition testimony, just like any other trial witness. ER 801(d)(1).

Northwest Orthopedic defends the trial court's exclusion of the affidavit by pointing to *Marthaller v. King County Hospital District No. 2*, 94 Wn. App. 911, 973 P.2d 1098 (1999), in which a medical expert's declaration in opposition to summary judgment said he was familiar with the standard of care of health care practitioners when performing endotracheal intubation and in his opinion, the intubation at issue in the case (which was performed by paramedics) failed to meet that standard. *Id.* at 918-19. When earlier deposed, however, the expert testified that he would not offer opinions on the standard of care applicable to paramedics. In affirming the trial court's summary judgment in favor of the defense, this court identified the *Marshall* rule as an alternative

basis for affirming; it affirmed in the first instance on statutory immunity grounds. *Id.* at 912-13. Unlike this case, the expert in *Marthaller* evidently offered no explanation for the inconsistency.

*Fosamax Products* provides a more complete analysis of the application of the sham affidavit rule to experts, holding that "a sham issue of fact exists only when the contradictions in an expert witness's testimony are inescapable and unequivocal in nature." 707 F.3d at 194. "[I]f there is a plausible explanation for discrepancies in a party's testimony, the court . . . should not disregard the later testimony because an earlier account was ambiguous, confusing, or simply incomplete." *Id.* (second alteration in original) (internal quotation marks omitted) (quoting *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 106 (2nd Cir. 2011)).

*Fosamax Products* is illustrative of an "inescapable and unequivocal" inconsistency. In that product liability action against Merck, Sharpe & Dohme Corp. (Merck), the plaintiff suffered bone death of the jaw—osteonecrosis, or "ONJ"—that she attributed to taking the drug Fosamax from 1998 until she was diagnosed with ONJ in 2005. 707 F.3d at 191. When Merck moved for summary judgment, the plaintiff responded with an affidavit from Dr. Lawrence Epstein who was her treating physician until 2003, when she changed doctors. Dr. Epstein testified that the physician who treated the patient after 2003 had agreed in a conversation with Dr. Epstein to assume the patient's care and follow Dr. Epstein's care plan, that Dr. Epstein knew the plaintiff

27

continued to take Fosamax, and if Merck had warned him about the risk of ONJ he would have recommended that the plaintiff stop taking the drug. *Id.* at 192. Yet when Dr. Epstein was deposed as a fact witness three years earlier, he testified that he was not aware that the plaintiff was continuing on Fosamax in 2004 and 2005, or that the successor physician had continued to prescribe it "'for two years more than what [he] suggested.'" *Id.* at 192 (alteration in original). He also testified when deposed that he "'did not know that she was on Fosamax from 2003 to 2005 because [he] had wanted her on [a different drug].'" *Id*. (alterations in original).

In affirming the district court's dismissal of the plaintiff's complaint, the Second Circuit held that these were "diametrically different stor[ies]" for which Dr. Epstein offered no explanation. *Id.* at 194. "Had there been some readily apparent, plausible explanation for these inconsistencies," the court continued, "or had [plaintiff] proffered such an explanation, we might conclude that the District Court had erred in rejecting Dr. Epstein's testimony." *Id.* "But where, as here, the relevant contradiction is not only unequivocal but is left unexplained—indeed, is inexplicable—a district court may determine that a plaintiff has manufactured a sham issue of fact." *Id.*

In this case, Dr. Collier's inconsistency was testifying when deposed that he had no criticisms of Drs. Lynch or Powers and then later providing a declaration expressing the opinion that they had violated a shared responsibility for adequate postsurgical monitoring. He offered two explanations for his failure to disclose this alleged omission

when deposed. One is that he found the questioning by Dr. Lynch's lawyer, who was the lead questioner, to be "narrow" and "confin[ing]," as a result of which "I perhaps made misstatements." CP at 535. A second was that, in answering questions, he had in mind affirmative care, not "non-care." CP at 538. He and the Behrs pointed to portions of his deposition in support of these explanations.

On the issue of his discomfort with the approach of the deposition, Dr. Collier testified that this was only the sixth or seventh time he had been deposed as an expert. He also pointed to qualifications he voiced when asked if he had expressed all of his opinions:

Q. . . . Have you fully expressed the opinions that you've reached in this case?

A. *Pretty much so*.

Q. Have you reached opinions on any other subject or topic that you haven't told us about?

A. No, sir. *What I was allowed to testify about; sure.*

Q. I'm sorry?

A. *What I was allowed to talk about; sure.*

MR. THORNER: Thank you. No further questions.

EXAMINATION

BY MR. BRUYA:

Q. Just to clarify, I'm Ed Bruya on behalf of Dr. Anderson. You've expressed all of your opinions today with Mr. King?

A. *To the extent he would let me answer; sure.*

Q. To the extent?

29

A. *Well, he objected to a lot of things in there, so, yes.* Basically— yes, I think that my opinion is that Dr. Anderson missed the compartment syndrome and should have done compartment pressures on the patient.

CP at 353 (emphasis added). He also offered an excerpt of a deposition he had given that

adopted the approach with which he claimed to be familiar: an open-ended request for his

opinions without first pinning him down on his view of specific care provided to the

plaintiff in the case.[10]

Dr. Collier also explained that he had in mind "care," and "[t]here was no care to

critique after the early-morning visit by [PA Buescher]. The issue is not 'the care,' as it

is the 'non-care.'" CP at 538. He pointed to answers he gave in his deposition that he

contended reflect a consistent concern on his part about "non-care":

Q. So my question is, as it relates to orthopedic surgeons or PAs working for orthopedic surgeons on December 10th of [20]10, do you have any criticisms of those healthcare providers on that date?

A. According to their notes, no, sir, but I believe on 12/10 is when Mr. Behr started developing his compartment syndrome, but no one saw him the rest of the day, other than nursing for the most part.

Q. So are you of the opinion that any orthopedic surgeon on 12/10 of 2010 in any way deviated from the standard of care in their management of this patient on that date?

A. No orthopedic surgeon saw him on 12/10. We have a PA who saw him—looks like early in the morning, but then no one sees him [un]til the next day.

---

[10] To be clear, we find nothing wrong with the approach that was taken in deposing Dr. Collier.

30

> Q. Are you of the opinion that any orthopedic surgeon on 12/10 of [20]10 deviated from the standard of care in their management of this patient on that date?
>
> A. On that date in particular, by the notes, no, sir. But I think that's when he started developing his compartment syndrome.
>
> MR. KING: Move to strike as being nonresponsive.

CP at 677-78.

For us to find that Dr. Collier's declaration in opposition to summary judgment was a sham, we would need to find his explanations for the inconsistency too implausible to present a question for the jury. His explanations suffice to present a jury question. "It is not the Court's province to 'engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment.'" *Jin Dong Wang v. LW Rest., Inc.*, 81 F. Supp. 3d 241, 260 (E.D.N.Y. 2015) (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014)).

Nor would belated disclosure alone provide a basis for excluding Dr. Collier's declaration. On the same day in early April 2014 that the trial court heard argument of the summary judgment motions, it continued the trial for other reasons to early 2015. As our Supreme Court has observed in the context of untimely opposition to a summary judgment motion:

> "'[O]ur overriding responsibility is to interpret the rules in a way that advances the underlying purpose of the rules, which is to reach a just determination in every action.'" *Burnet*, 131 Wn.2d at 498 (citing CR 1). The "'purpose [of summary judgment] is not to cut litigants off from their right of trial by jury if *they really have evidence which they will offer on a*

*trial*, it is to carefully test this out, in advance of trial by inquiring and determining whether such evidence exists.'" *Preston v. Duncan*, 55 Wn.2d 678, 683, 349 P.2d 605 (1960) (quoting *Whitaker v. Coleman*, 115 F.2d 305, 307 (5th Cir.1940)).

*Keck v. Collins*, 184 Wn.2d 358, 369, 357 P.3d 1080 (2015) (some emphasis omitted) (second alteration in original).

The trial court erred in excluding Dr. Collier's declaration in opposition to summary judgment. His declaration that the standard of care requires postoperative monitoring, in combination with Dr. Powers's interrogatory response that Northwest Orthopedic physicians shared responsibility for patient care, created a genuine issue of material fact. *See Grove* II, 182 Wn.2d at 141 (affirming liability where experts testified that patient care fell below the standard of care in light of inadequate monitoring and failure to rule out a known possible postoperative complication). Later-produced evidence suggests that perhaps the responsibility was *not* shared, and that Northwest Orthopedic had particular physicians on call at particular times. But when the only answer the Behrs had received to discovery was that it was a shared responsibility, they and Dr. Collier were entitled to rely on that answer.

Because we find it was error to treat Dr. Collier's declaration as a sham affidavit, we need not address the Behrs' arguments (1) that his additional opinions were timely "corrections" to his deposition permitted by CR 30(e), or (2) that the second and third trial courts erred by failing to reinstate the claims.

32

Drs. Lynch and Powers and Northwest Orthopedic contend that in light of the jury verdict, the trial court's error in refusing to consider Dr. Collier's declaration opposing summary judgment was harmless. After addressing the Behrs' challenges to the verdict, we return to the issue of harmless error.

II.     THE TRIAL COURT ABUSED ITS DISCRETION IN SUSTAINING OBJECTIONS TO DR. COLLIER TESTIFYING TO THE STANDARD OF CARE OF A PHYSICIAN ASSISTANT AND IN GRANTING PARTIAL JUDGMENT AS A MATTER OF LAW ON THAT BASIS

Dr. Collier testified in opposition to PA Bach's 2014 motion for summary judgment that "there is no specific physician's assistant standard of care, because physician's assistants are held to the same standard of care as the physicians for whom they work." CP at 324. Northwest Orthopedic's motion for an in limine order precluding Dr. Collier from testifying to a PA's standard of care was denied. RP at 246. When the Behrs' lawyer sought to question Dr. Collier about the standard of care of a physician assistant at trial, he encountered repeated objections, sustained by the trial court, to a lack of foundation and that the questions called for a legal conclusion. The Behrs ultimately did not present testimony on a PA's standard of care.

Physician assistants were recognized as health care professionals in Washington in 1971. LAWS OF 1971, 1st Ex. Sess., ch. 30, §§ 1-12 (codified in chapter 18.71A RCW). "A purpose of the statutes which authorize the use of physician's assistants is to relieve the physician of routine and repetitive tasks, allowing the physician's specialized training and expertise to be used more efficiently." *Wash. State Nurses Ass'n v. Bd. of Med.*

*Examiners*, 93 Wn.2d 117, 121, 605 P.2d 1269 (1980). "The assistant acts on behalf of

the physician, allowing the physician to care for many more patients at one time and

reducing the cost of health care." *Id.*

To give effect to this purpose, Washington statutes place physician assistants in

the position of agents for their supervising physicians. *Id.* at 120. While chapter 18.71A

RCW has been amended over the years, the substance of two provisions that the Supreme

Court identified in 1980 as reflecting the legislative intent to create an agency

relationship remains unchanged:

> RCW 18.71A.020(2) states that "each physician's assistant shall practice
> medicine only under the supervision and control of a physician licensed in
> this state." RCW 18.71A.050 states that "any physician shall retain
> professional and personal responsibility for any act which constitutes the
> practice of medicine . . . when performed by a physician's assistant in his
> employ." These provisions for control and responsibility indicate that the
> actions of the assistant are to be considered as actions of the supervising
> physician.

*Wash. State Nurses Ass'n*, 93 Wn.2d at 120 (alteration in original). *Compare* RCW

18.71A.020(2)(b)(ii) *and* RCW 18.71A.050.

Under chapter 18.71A RCW, the services a PA may perform are those they are

competent to perform based on their education, training, and experience, and that fall

within the scope of the services that are agreed to by the PA and the PA's supervising

physician in a practice agreement (formerly a "delegation agreement"). RCW

18.71A.030. The PA's practice of medicine must not be beyond the supervising

physician's own scope of practice or the practice agreement. *Id.* Responding to questions at oral argument, Northwest Orthopedic's appellate counsel stated that patients are not warned that a PA who substitutes for the supervising physician is held to a lower standard of care than the physician. Wash. Court of Appeals oral argument, *Behr v. Anderson*, No. 36222-1-III (Dec. 9, 2020), at 36 min., 15 sec. through 36 min., 36 sec. (on file with court). He stated that the patient is not given a choice, as a general rule, of receiving care from a physician rather than a PA. *Id.* at 36 min., 36 sec. through 36 min., 55 sec.

Regulation of PAs varies by state, and courts have reached different conclusions on whether a PA should be held to the standard of care of the physicians for whom the PA substitutes. *E.g.*, *Cleveland v. United States*, 457 F.3d 397, 404 (5th Cir. 2006) (applying physician standard of care to PA is consistent with Louisiana law); *but cf. Cox v. M.A. Primary & Urgent Care Clinic*, 313 S.W.3d 240 (Tenn. 2010) (a reduced standard of care applies under Tennessee law). This presents a question of law for the court. Given that Washington statutes treat physician assistants as agents of the physician, we hold that they must be held to the standard of the physician, consistent with agency law. As a leading treatise observes:

> Since the physician's assistant is usually regarded as the agent of the supervising physician and is doing medical work that would otherwise be done by the physician, some states, by statute or common law decision, hold that the physician's assistant owes the same standard of care as the supervising physician.

35

DAN B. DOBBS, PAUL T. HAYDEN & ELLEN M. BUBLICK, THE LAW OF TORTS, § 301, at 190 (2d ed. 2011). After acknowledging the contrary holding of the Supreme Court of Tennessee, the treatise observes that if a physician assistant is held to a lesser standard accepted as professional practice by physician assistants,

> [t]his means that the assistant performing duties of the physician owes a lower standard of care than the physician himself. And the rule has practical consequences, not only in limiting the assistant's responsibility but also in permitting the supervising physician to avoid vicarious liability for the assistant's medical decisions that do not meet the medical standards that would apply had the physician himself made the decision. Nowhere else in agency law can the principal in effect lower the standard of care he owes by delegating his work to an agent who owes less care than the principal.

*Id.* (footnote omitted).

In diverging from agency law in this respect, the Tennessee Supreme Court concluded that a different standard of care must apply since physician assistants and physicians "are not equivalent categories of health care providers." *Cox*, 313 S.W.3d at 258. It reasoned that physician assistants do not go to medical school or complete a year of training, and they practice medicine within a specially circumscribed scope of practice. *Id.* at 257-58. This is true of PAs in Washington, as well. But the corollary is that unlike a physician, a PA *has* a circumscribed scope of practice. Given the agency relationship, a PA is properly held to the standard of care of a physician when the PA substitutes for the physician, performing services the PA is competent to perform, as agreed and reflected in his or her practice agreement.

36

Having determined that a PA is held to the standard of care of the physicians he or she assists, it follows that Dr. Collier, who was permitted to testify to the standard of care of the Northwest Orthopedic physicians,[11] was qualified to testify to the standard of care of their PAs. Nonetheless, objections to Dr. Collier's opinion testimony were raised on the basis that he does not personally use physician assistants in his practice.

Since the standard of care is that of a physician, whether Dr. Collier uses PAs should be irrelevant. But there is a further reason why this was an improper basis for sustaining objections to his testimony.

In Washington, the admissibility of expert testimony is governed by the rules of evidence. *Frausto*, 188 Wn.2d at 239. ER 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The rule has been construed to require that the testimony will assist the trier of fact and that the witness qualifies as an expert. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918, 296 P.3d 860 (2013). Categorical disqualifications are inconsistent with the rule. *E.g.*, *Frausto*, 188 Wn.2d at 242-43; *In re Det. of A.S.*, 138 Wn.2d 898, 918, 982

---

[11] Dr. Collier testified that he had determined by communicating with orthopedic surgeons practicing medicine in Washington that the Washington standard for diagnosing, treating and caring for tibial plateau fractures, and for monitoring and treating compartment syndrome, is the national standard, with which he is familiar. RP at 690-91.

P.2d 1156 (1999); *Hill v. Sacred Heart Med. Ctr.*, 143 Wn. App. 438, 446, 177 P.3d 1152 (2008). The issue the trial court must determine is "whether [the witness's] knowledge of the subject matter is such that his opinion will most likely assist the trier of fact in arriving at the truth." *Holmgren v. Massey-Ferguson, Inc.*, 516 F.2d 856, 857-58 (8th Cir. 1975). Whether an expert's testimony is admissible depends on whether the subject matter is within his or her area of expertise. *See In re Marriage of Katare*, 175 Wn.2d 23, 38, 283 P.3d 546 (2012).

We review the decision to exclude an expert witness's testimony for abuse of discretion. *Driggs v. Howlett*, 193 Wn. App. 875, 896-97, 371 P.3d 61 (2016). Discretion is abused if it is exercised on untenable grounds or for untenable reasons, and a decision is based on untenable grounds or made for untenable reasons if it was reached by applying the wrong legal standard. *Id.* at 897.

"[S]o long as a physician with a medical degree has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue, ordinarily the physician 'will be considered qualified to express an opinion on any sort of medical question, including questions in areas in which the physician is not a specialist.'" *Morton v. McFall*, 128 Wn. App. 245, 253, 115 P.3d 1023 (2005) (quoting *White v. Kent Med. Ctr., Inc.*, 61 Wn. App. 163, 173, 810 P.2d 4 (1991)). To categorically disqualify a physician from testifying to the standard of care of a PA because he personally chooses not to use them as practice extenders is irreconcilable with the standard provided by ER

702. A physician may choose not to assume the supervisory responsibility and liability that comes along with employing PAs. *Cf.* RCW 18.71A.120(1)(a) (entering into a practice agreement with a PA must be voluntary for the supervising physician; the physician may not be compelled to participate as a condition of employment). The choice not to employ PAs does not mean the physician is unfamiliar with their role and incapable of providing information within his or her area of expertise that is helpful to the jury.

As previously observed, Dr. Collier testified that he works with physicians who use physician assistants, is familiar with the PAs' relationship to their supervising orthopedic surgeons; has seen PAs work in operating rooms, on the floors, and in evaluating patients; and has spoken with colleagues about their PAs' scope of authority. It was an abuse of discretion to foreclose his testimony.

Judgment as a matter of law dismissing the Behrs' claims based on acts or omissions of PA Bach was based on their failure to present evidence that she had breached the applicable standard of care. It is clear from the record that the Behrs could have offered such evidence from Dr. Collier. In 2014, when PA Bach was still a defendant in the case, she was denied summary judgment dismissal of the claims against her based on Dr. Collier's deposition and declaration testimony that she had violated the applicable standard of care. Dr. Collier's testimony that an orthopedist's PA is held to the standard of care of an orthopedic surgeon, which, in Washington, is the national

standard of care with which he is familiar, was deemed sufficient. CP at 894. Because

Dr. Collier should not have been foreclosed from testifying to the standard of care at trial,

the judgment as a matter of law must be reversed.

We reverse the summary judgment dismissal of claims against Drs. Lynch and

Powers and reverse dismissal of the claim against Northwest Orthopedic that was

predicated on PA Bach's alleged acts and omissions. We otherwise affirm. The case is

remanded for further proceedings.

A majority of the panel having determined that only the foregoing portion of this

opinion will be printed in the Washington Appellate Reports and that the remainder

having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it

is so ordered.

III.   ASSIGNMENTS OF ERROR TO DISCOVERY AND IN LIMINE RULINGS

   A.   The trial court did not abuse its discretion in denying the pretrial motion
   to impose liability against Northwest Orthopedic and PA Bach as a discovery
   sanction (Assignment of Error 3)

In December 2017, the Behrs filed a motion complaining about Northwest

Orthopedic's and PA Bach's failure to answer their written discovery. It asked the trial

court for a variety of relief, including to strike certain evidence of those parties that

would have been responsive to the discovery. "Default" was not mentioned. The Behrs'

reply in support of its motion likewise did not use the word "default," although they did

suggest that Northwest Orthopedic should "be established as . . . liable" and "Plaintiffs

40

would be content to have the court find [Northwest Orthopedic] . . . liable on summary judgment." CP at 3633.

Sanction rules give a trial judge wide latitude to determine what sanctions are proper in a given case. *Wash. State Physicians Insur. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993). The sanction imposed should be proportional to the discovery violation and case circumstances and should also advance the purposes of discovery. *Magaña v. Hyundai Motor Am.*, 167 Wn.2d 570, 590, 220 P.3d 191 (2009). "[T]he least severe sanction that will be adequate to serve the purpose of the particular sanction should be imposed. The sanction must not be so minimal, however, that it undermines the purpose of discovery. The sanction should insure that the wrongdoer does not profit from the wrong." *Fisons*, 122 Wn.2d at 355-56 (footnote omitted). A trial court's rulings on discovery sanctions are reviewed for abuse of discretion. *Burnet*, 131 Wn.2d at 494.

Washington case law holds that when the trial court selects one of the harsher remedies under CR 37(b)

> it must be apparent from the record that the trial court explicitly considered whether a lesser sanction would probably have sufficed, and whether it found that the disobedient party's refusal to obey a discovery order was willful or deliberate and substantially prejudiced the opponent's ability to prepare for trial.

41

*Burnet*, 131 Wn.2d at 494 (internal quotation marks omitted) (quoting *Snedigar v.*

*Hodderson*, 53 Wn. App. 476, 487, 768 P.2d 1 (1989), *rev'd in part on other grounds*,

114 Wn.2d 153, 786 P.2d 781 (1990)).

The trial court's written order denying the Behrs' motion to strike contains no

findings. But its oral ruling reveals that it denied the motion because it accepted

Northwest Orthopedic's and PA Bach's explanation that their substituted counsel had

overlooked the discovery requests but had since answered them:

> With regards to the strike of Bach and Northwest Orthopedic
> Surgeons evidence, I am also going to deny that motion as well. The
> answers were certainly required. I do have the information from the PA
> Bach response that counsel had overlooked answers. Those have been
> answered. Same thing with Northwest Orthopedic Specialties, those had
> been overlooked. They were answered.
> What I will allow is if there's some follow up questions based upon
> those late answers that need to be asked, I will allow the plaintiff to do that.
> This extends the discovery deadline the court imposed, but, based upon the
> fact that interrogatories were not timely answered, the plaintiff is entitled to
> follow up with the answers. If there ends up being discovery issues and
> things that the plaintiff doesn't think were produced through his discovery
> requests, you still have your discovery master that can take care of some of
> those things. I don't know whether using the discovery master is practical
> between now and trial, but he is still out there.

CP at 4911.

The Behrs have failed to show that the trial court abused its discretion. The trial

court found no deliberate or willful failure to respond.

A lesser sanction was available in the form of additional discovery. On the day

the trial court heard the motion and authorized additional discovery by the Behrs (Feb. 9,

2018), almost three months remained before trial. The relief ordered was well within the

trial court's broad discretion as a less severe sanction that served the purpose of

discovery. *Fisons*, 122 Wn.2d at 341.

      B.      The Behrs fail to provide reasoned argument challenging the bases for the trial court's in limine rulings excluding evidence of fault by particular individuals at particular times. (Assignment of Error 7)

The Behrs' seventh assignment of error is to "[d]isallowing testimony regarding

the liability of [Northwest Orthopedic] prior to 3 p.m. on 12/10/10 (or 3 p.m. on

12/11/10, as the order internally conflicts)." Opening Br. of Appellant at 5 (some

capitalization omitted). The only record citation they provide to the complained-of order

is to the court's unrelated order on Northwest Orthopedic's half-time motion for

judgment as a matter of law. *See id.* at 48 (citing CP at 5833-34).

The Behrs appear to be complaining about the combined effect of the trial court's

rulings on defense pretrial motions in limine (MIL), including MIL numbers 24, 37, 47

and 48. Evidentiary rulings are reviewed for abuse of discretion. *State v. Ellis*, 136

Wn.2d 498, 504, 963 P.2d 843 (1998).

The trial court ruled on MIL 24 that Dr. Collier could not testify to what the

results of an exam would have been had an orthopedic surgeon examined Mr. Behr's

lower extremity on December 10, from noon to midnight. This was based on Dr.

Collier's deposition testimony that he had no idea what the findings of such an exam

would have been; he would have to speculate.

43

The trial court ruled on MIL 37 that Dr. Collier could not render opinions on the standard of care owed on December 10 by dismissed parties Lynch and Powers, but could offer opinions critical of Dr. Anderson. This was based on Dr. Collier's deposition testimony that Drs. Lynch and Powers had not violated the standard of care on that day.

The trial court ruled on MIL 47 that Dr. Collier could not offer the criticism of Drs. Lynch and Powers set forth in his 2014 declaration in opposition to summary judgment. This was based on law of the case.

The trial court ruled on MIL 48 that Dr. Collier could not offer standard of care criticism of PA Bach or Dr. Anderson for failing to respond to PT Benage's telephone message left with Northwest Orthopedic on December 10, but could only ask if they were informed of the message. This was based on undisputed evidence that neither was on call or had a patient care responsibility on December 10.

In arguing this seventh assignment of error, the Behrs fail to address any of the bases on which the in limine rulings were presented and granted. They simply argue that the excluded evidence was consistent with their witnesses' testimony and their theory of the case. This fails to establish error.

We recognize, however, that had the trial court not dismissed the claims against Drs. Lynch and Powers, the in limine rulings on MIL 37 and 47 should not (and presumably would not) have been made. The question that remains and that we discuss hereafter is whether they, and the summary judgment decision, proved harmless.

IV.    ALLEGED INSTRUCTIONAL ERROR AND DENIAL OF THE BEHRS' NEW TRIAL MOTION

   A.    Alleged instructional error (Assignments of Error 4 and 5)

The Behrs' fourth and fifth assignments of error challenge the trial court's instructions. RAP 10.3(g) provides that an appellant's brief must provide "[a] separate assignment of error for each instruction which a party contends was improperly given or refused . . . with reference to each instruction or proposed instruction by number." The Behrs fail to comply with the rule. We will excuse the Behrs' failure to provide a separate assignment of error for each instruction, but we will only address their challenges to instructions (given or not given) where they have identified the instruction or the proposed instruction by number.[12] The only instructions identified by number are three instructions proposed by the Behrs that the court refused to give: proposed instructions P-12, P-13, and P-14.

Instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and, when read as a whole, properly inform the jury of the applicable law. *Fergen*, 182 Wn.2d at 803. An instruction that misstates the applicable law is reversible error if it causes prejudice. *Id*. The court need not give an instruction that is erroneous in any respect. *State v. Hoffman*, 116 Wn.2d 51, 110-11, 804

---

[12] To challenge the trial court's *failure* to give a jury instruction, an appellant must have proposed the instruction in the trial court. *Gorman v. Pierce County*, 176 Wn. App. 63, 86, 307 P.3d 795 (2013) (citing *McGarvey v. City of Seattle*, 62 Wn.2d 524, 533, 384 P.2d 127 (1963)).

P.2d 577 (1991). The trial court has discretion in the wording and number of jury

instructions; its exercise of discretion is reviewed for abuse of discretion. *Fergen*, 182

Wn.2d at 802. The discretion afforded the trial court in the wording of instructions

means it need not give additional instructions, even when they are correct, if the court's

other instructions are sufficient. *Gammon v. Clark Equip. Co.*, 104 Wn.2d 613, 617, 707

P.2d 685 (1985).

The Behrs' proposed instructions P-12, P-13 and P-14 were all nonpattern

instructions. Their proposed instruction P-12 stated:

> As Northwest Orthopedic Specialists employs healthcare providers, it is
> itself a healthcare provider, and must manage its employees such that its
> employees meet the standard of care owed to orthopedic patients.

CP at 5781. The legal authority offered for the instructions was RCW 7.70.020(3). *Id.*

RCW 7.70.020(3) provides that among the meanings of "health care provider" is

"[a]n entity . . . employing one or more persons [defined as a health care provider by

RCW 7.70.020(1)]." It provides no support for instructing that such an entity "must

manage its employees such that its employees meet the standard of care owed to

orthopedic patients," however.

The trial court's instructions adequately explained the duty owed by a health care

professional, including a surgeon who holds himself or herself out as a specialist in

orthopedic surgery. They explained that Dr. Anderson was the agent of Northwest

Orthopedic and therefore any act or omission by him was an act or omission of

Northwest Orthopedic. The instructions given by the trial court were sufficient. It did

not abuse its discretion by refusing to give the Behrs' only partially supported proposed

instruction P-12.

The Behrs' proposed instructions P-13 and P-14 stated:

### INSTRUCTION NO. P-13

A team of individuals responsible to care for a patient has a team responsibility to that patient such that every person in that team has an independent duty of care to its patients, as part of a team, as well as individually, and that responsibility passes through successive care-givers as the team cares for the patient. The failure of successive care-givers to meet the appropriate duty of care makes the employing entity responsible for any medical negligence, even if the responsible individual cannot be identified.

Any act or omission of a Northwest Orthopedic Specialists' employee was an act or omission of Northwest Orthopedic Specialists.

### INSTRUCTION P-14

The failure to meet the appropriate duty of care makes the employing entity, Northwest Orthopedic Specialists in this instance, responsible for any medical negligence, even if the responsible individual cannot be identified, or if an individual has been mis-identified as a responsible individual during trial.

It is appropriate, if it conforms to the evidence, to find a named individual defendant not liable for negligence while still finding Northwest Orthopedic Specialists liable for the negligence attributable to the employees of Northwest Orthopedic Specialists.

CP at 5782-83. The legal authority offered for the instructions was the Washington

Supreme Court's decision in *Grove* II.

The trial court reasonably refused to give the proposed instructions because Dr. Anderson was the only healthcare provider of Northwest Orthopedic whose violation of the standard of care remained an issue for the jury.

Acts or omissions of more than one Northwest Orthopedic health care provider will be at issue on retrial, so we also address problems with the instructions proposed by the Behrs. While the Behrs complain that refusing to give their proposed instructions deprived the jury of Washington law established by *Grove* II and *Hansch v. Hackett*, 190 Wash. 97, 66 P.2d 1129 (1937), the juries in both of those cases reached their verdicts by applying standard instructions on duty and vicarious liability. *Hansch* held that the appellant, Columbia Clinic, Inc., was liable "if at all, under the rule of respondeat superior, and that rule would apply to negligence by any one of its officers, employees, or servants," whether or not its negligent officer, employee or servant was named individually as a defendant. 190 Wash. at 102 (emphasis omitted). *Grove* II held that this court failed to apply existing law; it did not claim to be making new law. Post-*Grove* II, no new instruction should be needed.

The Behrs' concept that an entity can be held liable any time "a responsible individual cannot be identified" is not supported by *Hansch* or by *Grove* II. As explained by the Supreme Court in *Grove* II, the trial court's error in overturning the jury's verdict in favor of Grove (and this court's error in affirming) was that Grove's experts had

testified "regarding the standard of care and breach of that standard *by identified surgeons* who are 'health care providers.'" 182 Wn.2d at 150 (emphasis added).

Finally, the Behrs argue that without its proposed instructions, the court's instructions failed to incorporate the opinion of their second physician expert, David Cossman, M.D., that negligence occurs any time a patient is under an entity's direct care and there is failure to diagnose compartment syndrome before permanent tissue and function loss. Jury instructions state the law, not experts' opinions. Dr. Cossman's opinion is not the law.

No abuse of discretion is shown.

B.      The Behrs do not demonstrate that Northwest Orthopedic raised a new
        defense giving rise to an issue of informed consent

During the Behrs' case, Dr. Collier testified that any time there is "an indication or an inkling" of compartment syndrome, the standard of care requires an immediate fasciotomy. RP at 742. He volunteered that "[n]o one's ever been accused . . . of doing something wrong [for] doing a fasciotomy." RP at 709.

In the defense case, Dr. Anderson testified that he arrived at the conclusion that Mr. Behr did not have compartment syndrome on December 11 "[b]ecause of the history and the physical exam findings did not indicate compartment syndrome." RP at 1402. He was questioned at length about how and why he arrived at that conclusion.

Only after Dr. Anderson explained how and why he concluded that compartment syndrome was not present did defense counsel ask him if there were risks associated with performing a fasciotomy. Dr. Anderson identified as risks "swelling in the leg, muscle weakness, painful scarring, itching . . . [and u]sually . . . two or three additional surgeries, one being a skin graft." RP at 1435. For patients who had a fracture and/or internal fixation, he identified as additional risks a "higher chance of the fracture, or hardware . . . becoming infected . . . [a]nd . . . not healing or not healing correctly." *Id.* He testified that in his training, one would need to have "an appropriate level of clinical certainty" to proceed with a fasciotomy. RP at 1436. The Behrs did not object to this testimony as it was given. A recess was taken immediately after this line of questioning, and no belated objection was made following the recess.

For the first time after trial, the Behrs argued in a motion for a new trial that this "surprise" testimony by Dr. Anderson revealed a previously-undisclosed issue of informed consent. They characterized Dr. Anderson as weighing whether *to perform a compartment pressure test and fasciotomy for suspected compartment syndrome* against *the risk of a fasciotomy*, and as deciding to "wait . . . out" the risk of compartment syndrome. CP at 6622; RP at 1840. They argued that this implicated a duty to give Mr. Behr the right to make his own fully-informed decision. They argued it was now apparent that the reason the defense wanted an error of judgment instruction was to argue this "selection of diagnoses" to the jury. They argued they should be allowed to file an

amended complaint to include a lack of informed consent claim. The only legal authority and analysis offered in support was a single citation to "CR59(a)(1,2,3,7,8&9)." CP at 6627.

We employ an abuse of discretion standard in reviewing denial of motions for new trial. *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 454, 191 P.3d 879 (2008) (citing *Aluminum Co. of Am. v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 537, 998 P.2d 856 (2000)).

Contrary to the Behrs' argument, Northwest Orthopedic argued to the jury in closing that the selection of diagnoses with which Dr. Anderson was presented on Saturday, December 11, was whether Mr. Behr was experiencing postoperative pain *from the tibial plateau fracture and the surgery* or postoperative pain *caused by compartment syndrome. See* RP at 1803. This was the same diagnostic choice it identified when requesting the exercise of judgment instruction. Northwest Orthopedic argued in closing that Dr. Anderson "ruled [compartment syndrome] out based on the clinical examination that Dr. Collier agreed . . . was the standard of healthcare practice." RP at 1803-04. It said nothing in its closing about the risks of a fasciotomy. Its own experts had agreed that if compartment syndrome is indicated, the only course of action is a fasciotomy. *E.g.*, RP at 1563.

When a party fails to object to testimony on a ground raised on appeal, the claims are not preserved for review. *Panorama Vill. Homeowners Ass'n v. Golden Rule*

*Roofing, Inc.*, 102 Wn. App. 422, 426, 10 P.3d 417 (2000).  And when a claim of surprise

and prejudice is not made promptly—in this case is not raised until a week after the jury's

verdict—the claim of surprise is suspect, to say the least.

The Behrs offer no persuasive argument that a new, material issue was introduced

by Dr. Anderson's trial testimony about the risks of a fasciotomy.  They cannot

demonstrate that the trial court abused its discretion in denying their motion for a new

trial.

V.      THE ERROR IN GRANTING SUMMARY JUDGMENT DISMISSAL OF THE CLAIMS
        AGAINST DRS. LYNCH AND POWERS WAS NOT HARMLESS

Having concluded that the Behrs raise no error that would cause us to reverse the

verdict in favor of Northwest Orthopedic on the narrowed claim presented to the jury, we

address whether the error in dismissing the claims against Drs. Lynch and Powers on

summary judgment was harmless in light of the verdict.

Northwest Orthopedic argues that the erroneous pretrial dismissal of a party is

harmless if the jury, by its verdict, necessarily concludes that the conduct of the

dismissed party was not negligent, citing *Sehlin v. Chicago, Milwaukee, St. Paul &*

*Pacific Railroad Co.*, 38 Wn. App. 125, 129-30, 686 P.2d 492 (1984), and *Bundrick v.*

*Stewart*, 128 Wn. App. 11, 114 P.3d 1204 (2005).  Br. of Resp't Northwest Orthopedic

at 17.  "Collateral estoppel applies when (1) the issue decided in the prior adjudication is

identical with the one presented in the second action; (2) the prior adjudication must have

ended in a final judgment on the merits; (3) the party against whom the plea is asserted

was a party or in privity with the party to the prior adjudication; and (4) application of the

doctrine does not work an injustice." *Bundrick*, 128 Wn. App. at 19 n.6 (quoting *Nielson*

*v. Spanaway Gen. Med. Clinic, Inc.*, 135 Wn.2d 255, 262-63, 956 P.2d 312 (1998)).

The critical question in applying collateral estoppel in this case is whether the

issue decided by the jury's verdict is identical to the issue that would be presented in a

retrial. "[A]pplication of collateral estoppel is limited to situations where the issue

presented in the second proceeding is identical in all respects to an issue decided in the

prior proceeding," and where the controlling facts and applicable legal rules remain

unchanged. *Lemond v. Dep't of Licensing*, 143 Wn. App. 797, 805, 180 P.3d 829 (2008)

(citing *Standlee v. Smith*, 83 Wn.2d 405, 408, 518 P.2d 721(1974)). The proponent of

collateral estoppel as to a particular issue involved in a pending case bears the burden of

establishing that the issue was actually determined and necessarily adjudicated in the

prior action if the record does not clearly reflect such determination. *Id.*

*Sehlin* and *Bundrick*, on which Northwest Orthopedic relies, present clear-cut

identical issues. In *Sehlin*, the operator of heavy machinery that fatally injured Sehlin

was arguably the agent or servant of the company that employed him, or the railroad that

rented the equipment and the operator's services, or both. The trial court ruled that he

was the agent/servant of the railroad and dismissed claims against his employer. The jury

was instructed that the operator was the agent of the railroad and the jury returned a

53

defense verdict. 38 Wn. App. at 129. In addressing on appeal whether the trial court

erred in dismissing the claims against the operator's employer, this court held

> Assuming only for argument's sake this was error, it was harmless. The jury, instructed that [the operator] was Milwaukee Road's agent, found Milwaukee, its employees and agents were not negligent. Thus, the jury, having found [the operator] was not negligent, by that finding likewise absolved both possible masters under the doctrine of respondeat superior.

*Id.* at 129-30.

In *Bundrick*, the plaintiff claimed that when told by her doctor that a hospital

resident would be present during her tubal ligation surgery, she objected to the resident

performing the surgery and was assured by her doctor that the resident would only be

there to observe. 128 Wn. App. at 14. She thereafter signed a consent form in which she

arguably broadened her consent, by agreeing to "'all medical treatment or hospital

service, performed or prescribed by/or at the direction of the attending physician.'" *Id.*

A resident did participate in her surgery, there were complications, and Bundrick sued

her surgeon, his employer, the resident, and the hospital. *Id.* at 15. Her claim against the

hospital for medical battery, based on her alleged withholding of consent to participation

by the resident, was dismissed on summary judgment. *Id.*

Bundrick's claims against her surgeon and his employer also included the failure

to obtain her consent to the resident's participation in the surgery, and that claim

proceeded to trial. The jury returned a special verdict, in which it found the surgeon and

his employer liable for medical negligence, but not liable for a failure to obtain her

consent to the hospital resident's participation.  *Id.* at 15-16.

This court concluded on appeal that it was error to dismiss the medical battery

claim against the hospital because material facts were in dispute.  *Id.* at 19.  It concluded

that the medical battery claim against the hospital was foreclosed by collateral estoppel,

however:

> By its special verdict, the jury necessarily found that Bundrick did not
> communicate any limitation as to participants in her care.  Under the
> circumstances here, this is exactly the question necessary to decide the
> medical battery claim.

*Id.* at 20.

In this case, the issue presented to the jury was not identical to the issues that

would be presented in a trial of revived claims against Drs. Lynch and Powers.  The issue

presented to the jury had been narrowed to whether Dr. Anderson violated the standard of

care on or after the afternoon of Saturday, December 11, when he was on call and

responded to Mr. Behr's request to be seen by a physician.  The issues of whether Dr.

Lynch or Dr. Powers violated the standard of care were not tried and were not permitted

even to be suggested, given in limine rulings obtained by Northwest Orthopedic.[13]

---

[13] Recall that the trial court granted MIL 37 (Dr. Collier could not offer standard
of care opinions on events of December 10 involving dismissed parties.), CP at 6839, and
MIL 48 (When it came to PT Benage's telephone message left with Northwest
Orthopedic, the Behrs could ask Dr. Anderson and PA Bach if they received the
information, but the Behrs could not offer standard of care criticisms of Dr. Anderson or

Some of the evidence important to Dr. Anderson's defense would not be helpful in the same way to defending the performance of Drs. Lynch and Powers. Dr. Anderson was able to rely for his defense on more than 24 hours of intervening care by nurses and PAs who had not observed and noted any concerning symptoms of compartment syndrome. A theme of Northwest Orthopedic's closing argument was that jurors should "[r]emember that Dr. Anderson was just one of the persons who had his or her eyes, hands and ears available to Mr. Behr": that "a physician's assistant, Leann Bach . . . saw Mr. Behr on December the 11th at 10:30 in the morning, about four hours before Dr. Anderson saw the patient," and "There were nurses who saw the patient, Mr. Behr, all the way through his care, and particularly on Saturday and Sunday." RP at 1795. Drs. Lynch and Powers would not have had that reassuring history to rely on.

The defense might argue that if, as the jury found, the information available to Dr. Anderson on the afternoon of Saturday, December 11 would not cause a reasonable orthopedic physician to test compartment pressure or perform a fasciotomy, then the information available to Drs. Lynch and Powers a day earlier could likewise not have caused a reasonable orthopedic surgeon to suspect compartment syndrome. But the evidence presented to the jury on information available to Dr. Anderson consisted of less

---

PA Bach for not seeing Mr. Behr in response to the message.), CP at 6841-42. Northwest Orthopedic also obtained an in limine ruling that the Behrs, their counsel, and witnesses could not make any references that Northwest Orthopedic was liable based on dismissed parties. MIL 53; CP at 6842.

*concerning information* than would have been available to Drs. Lynch and Powers (it did

not include PT Benage's observations) and more *reassuring information* (the reported

observations of PA Bach and nursing staff) than would have been available on December

10.

Dr. Anderson testified that he also relied on his own examination of Mr. Behr on

December 11, but the evidence of his examination was conflicting and Dr. Collier was

critical of the examination and the conclusions Dr. Anderson drew from it. It is possible

that 10 jurors who found no liability did so because they believed Dr. Anderson's

testimony about his examination on December 11, that it conformed to the standard of

care, and that it, standing alone, was a basis for ruling out a diagnosis of compartment

syndrome, however. It is equally possible that their defense verdict had a different basis.

They might not have entirely believed Dr. Anderson's account of his examination or that

it alone was a basis for ruling out compartment syndrome, but accepted defense

arguments that Dr. Anderson, not knowing of PT Benage's observations, reasonably

relied on the history provided by PA Bach and nursing staff.[14]

Because the jury was affirmatively prevented from hearing evidence or argument

relevant to the Behrs' dismissed claims against Drs. Lynch and Powers, and because the

---

[14] Dr. Anderson testified he could not recall seeing PT Benage's December 10
note, but even if he had read it, it would not have changed his treatment approach, which
relied on his own diagnosis. But his response to the hypothetical was not necessary to the
verdict. Indeed, it was not even relevant, given that the Behrs had been ordered not to
raise a failure to respond to PT Benage's concerns as a standard of care issue.

timing of a call on Mr. Behr would change the mix of information available to the

responding physician, collateral estoppel does not apply.  It will apply only if the Behrs

attempt to present evidence or argue that Dr. Anderson violated the standard of care.[15]

V.       THE TRIAL COURT DID NOT ERR IN DISMISSING CLAIMS AGAINST DEACONESS AS A
         MATTER OF LAW

At trial, the Behrs' nursing expert, Linda Newman, RN, offered expert testimony

on nursing standards of care and Deaconess nurses' violations of those standards.

Among other standards of care, she testified that nurses are required to think critically,

advocate for a patient, and report significant symptoms or changes in a patient's

condition up the chain of command and to the attending physician until a physician

intervenes.  She testified, "We protect the patient, not the physician."  RP at 889.  She

testified that two Deaconess nurses violated the standards of care by failing to escalate

Mr. Behr's and PT Benage's concerns until they were sure attending physicians were

aware of them and received a suitable physician response.  She did not testify that any

violation of the standard of care caused injury to Mr. Behr.

---

[15] If evidence presented arguably suggests that Dr. Anderson violated the standard
of care, the jury can be instructed that a breach of the standard of care by Dr. Anderson is
not at issue.  Any instruction should not invite an inference that the claims being tried
have already been rejected. *See, e.g.*, *State v. Stein*, 140 Wn. App. 43, 64, 165 P.3d 16
(2007) (court declined to advise jury that defendant had earlier been acquitted of certain
crimes because fairness would require it to advise jury about aspects of the prior trial that
would not be helpful to the defense).

Deaconess moved for judgment as a matter of law on the basis that the Behrs had not proved that those alleged violations of the standard of care were the proximate cause of Mr. Behr's injuries. The Behrs argue that their physician experts' testimony was sufficient.

We review de novo a trial court's decision to grant a motion for judgment as a matter of law. *Alejandre v. Bull*, 159 Wn.2d 674, 681, 153 P.3d 864 (2007). In ruling on such a motion, a trial court exercises no discretion. *Douglas v. Freeman*, 117 Wn.2d 242, 247, 814 P.2d 1160 (1991). The evidence must be viewed in the light most favorable to the nonmoving party and the court may grant the motion only where there is no competent evidence or reasonable inference that would sustain a verdict for the nonmoving party. *Id.* "'If there is any justifiable evidence upon which reasonable minds might reach conclusions that sustain the verdict, the question is for the jury.'" *Id.* (quoting *Lockwood v. AC&S, Inc.*, 109 Wn.2d 235, 243, 744 P.2d 605 (1987)).

Proximate cause is some reasonable connection between the act or omission of the defendant and the injury the plaintiff suffered. *Estate of Dormaier v. Columbia Basin Anesthesia, PLLC*, 177 Wn. App. 828, 313 P.3d 431 (2013). As the jury was instructed, proximate cause is "a cause which in a direct sequence, produces the injury complained of and without which such injury would not have happened." CP at 6588; *e.g.*, *Schnall v. AT&T Wireless Servs., Inc.*, 171 Wn.2d 260, 278, 259 P.3d 129 (2011). There may be more than one proximate cause of an injury, and the concurring negligence of a third

party does not necessarily break the causal chain from the original negligence to the final injury. *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 437, 378 P.3d 162 (2016).

Where the standard of care violated by a nurse is the failure to monitor and notify attending physicians of significant symptoms or changes, this court held in *Colwell v. Holy Family Hospital*, 104 Wn. App. 606, 609, 15 P.3d 210 (2001), that only physicians, not nurses, are qualified to opine whether the nurses' omissions were the proximate cause of patient injuries. In *Colwell*, which involved a patient's death from undiagnosed internal bleeding, this court held that while the plaintiffs' expert, an RN, could testify to the standard of care of the Holy Family nurses, "a medical doctor must still generally connect Ms. Colwell's death to the alleged nursing deficiencies." *Id.* at 613.

In *Frausto*, the Supreme Court reviewed and qualified *Colwell*'s holding. It did not disagree with the proposition that nurses *may* be unqualified to opine on causation. It held, however, that nurses should not be categorically denied the right to express that opinion. Rather, whether or not a nurse (in *Frausto*, an ARNP) has the requisite specialized knowledge to qualify as an expert on causation "is a determination left to the trial court under our Rules of Evidence, taking into consideration the [nurse's] particular scope of practice and expertise." 188 Wn.2d at 243.

*Colwell* and this court's decision in *Hill* touch on the type of physician expert testimony that is sufficient evidence that a nurse's failure to comply with the standard of care was a proximate cause of injury.

In *Colwell*, the patient's treating physicians moved for summary judgment dismissal of the malpractice claims against them in the same time frame as Holy Family's summary judgment motion. In opposing the treating physicians' motions, the Colwells offered declarations of three physician experts who expressed the opinion that the treating physicians' standard of care violations proximately caused Ms. Colwell's death. The Colwells' opposition to the physicians' motions were successful.

The trial court dismissed the Colwells' claims against Holy Family, however, ruling that their nursing expert was unqualified to testify to proximate cause. The Colwells suggested on appeal that the trial court abused its discretion by failing to consider the expert declarations they had filed in opposition to the *physicians*' summary judgment motions.

This court rejected the argument, primarily on the basis that the physician experts' declarations were never called to the trial court's attention as evidence in opposition to the motion filed by Holy Family. "Moreover," this court held, "none of the doctors discussed medical causation by relating any nursing deficiency within Holy Family to Ms. Colwell's death. Under these circumstances, summary judgment was appropriate." *Colwell*, 104 Wn. App. at 614.

In *Hill*, the plaintiff sought to prove that Sacred Heart's nurses' standard of care violations were a proximate cause of his injury by (1) having plaintiff's nursing expert identify standard of care violations, and (2) having plaintiff's physician experts point to

nursing standard of care violations thus identified that, in the physician's opinion,

contributed to the patient's injuries. 143 Wn. App. at 449-51. This court held the

evidence to be sufficient because the physician experts related the nurses' standard of

care violations to the injury and resulting damage. *Id.* at 448.

Here, Drs. Collier and Cossman presumably have the specialized knowledge to

express an opinion on whether standard of care violations by Deaconess nurses identified

by RN Newman were a proximate cause of Mr. Behr's injuries. In testifying at trial,

however, Drs. Collier and Cossman never related the nurses' alleged standard of care

violations to Mr. Behr's injuries. The Behrs argue that the jury could infer a relation

between the violations and injuries, but in both *Colwell* and *Hill*, this court suggested that

the relation must be explicitly testified to by a qualified expert. The requirement that the

hospital nurses' fault "was a proximate cause of the injury complained of" is one of only

two elements identified by RCW 7.70.040 as "necessary elements of proof" in the Behrs'

medical malpractice case. It is consistent with the statute that this critical relation be

supported by expert testimony, not jury inference.

Because judgment as a matter of law was properly granted on this basis, we need

not consider the alternative grounds for dismissal argued by Deaconess Hospital.

We reverse the summary judgment dismissal of claims against Drs. Lynch and

Powers and reverse dismissal of the claim against Northwest Orthopedic Specialists that

was predicated on PA Bach's alleged acts and omissions.  We otherwise affirm.  The case

is remanded for further proceedings.

_____
Siddoway, A.C.J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Fearing, J.