[No. 48753-1-I. Division One. August 12, 2002.]

NEWTON INSURANCE AGENCY & BROKERAGE, INC., *Respondent*, v. CALEDONIAN INSURANCE GROUP, INC., *Appellant*.

---

[3] RCW 2.06.040.

152

*Charles E. Watts* (of *Oseran, Hahn, Spring & Watts*), for appellant.

*Phillip D. Noble* (of *Helsell, Fetterman, L.L.P.*), for respondent.

ELLINGTON, J. — In this action for tortious interference and civil conspiracy, no questions of fact exist about Caledonian Insurance Group's liability to Newton Insurance Agency, or about the amount of damages. The trial court therefore properly granted summary judgment in favor of Newton, and we affirm.

## FACTS

In 1994, Newton Insurance Agency and Brokerage, Inc., purchased an insurance business from Terry Lynch, including all Lynch's accounts and customer base. The parties' agreement contained a noncompetition clause prohibiting Lynch from later competing for those accounts. Lynch agreed not to:

 A. Request or advise any of the clients who have been transferred by [Lynch] to [Newton] to withdraw or cancel insurance with [Newton]; [or]

 B. Solicit, sell, serve, divert, or receive insurance agency, brokerage, actuarial, or employee-benefit reporting business to or from any such client.[1]

Newton also hired Lynch as an insurance agent. The employment agreement contained an additional noncompetition clause covering all later-acquired accounts. The agreement provided that the accounts generated by Lynch would be owned by Newton, and that Newton's offer to hire Lynch was expressly conditioned upon his agreement not to:

 (a) Solicit, sell, serve, divert, [or] accept the customers, trade or business, or interfere with policy contracts of the [Newton] Agency or any client having any coverage with the [Newton] Agency existing as of the date of notice of [Lynch's] termination, [or] any prospective account being actively solicited by the Agency at that time;

 . . . .

 (c) Be an employee, employer, consultant, officer, director, partner, trustee, or shareholder of more than 1% of the outstanding stock of any person or entity that do any of the activities just listed.[2]

After learning that Lynch was selling insurance and keeping the commissions for himself, Newton fired Lynch on December 20, 1999. Three days later, Lynch was hired as

---

[1] Clerk's Papers at 31.

[2] Clerk's Papers at 40-41.

vice-president and insurance producer for Caledonian Insurance Group. Caledonian president Anthony Cowan acknowledged that he and Lynch discussed Lynch's non-competition agreements. He also testified that Caledonian hired Lynch expecting to obtain business from Newton's customers:

Q: During the course of your discussions with Mr. Lynch between December 20 and December 23, there were some discussions about obtaining a book of business from Newton Agency; is that correct?

A: Correct.

Q: And your offer to [hire] Mr. Lynch was contingent upon obtaining the book of business from the Newton Agency; isn't that correct?

A: Based on the enforceability of the covenant, and the fact that a number of these accounts had been with Terry Lynch prior to joining the Newton Agency, it was expected that some business [was] to follow.

Q: And it was on that basis you were willing to give Mr. Lynch an offer of employment?

A: Correct.[3]

It is undisputed that with the knowledge of Caledonian, Lynch contacted, obtained business from, and sold insurance to Newton customers:

Q: Subsequent to Mr. Lynch's becoming an employee of Caledonian, he contacted Newton clients; are you aware of that?

A: Yes.

Q: And are you aware that a number of those clients transferred their business to Caledonian—

A: Yes.

Q: —after Mr. Lynch contacted them?

A: Yes.

---

[3] Clerk's Papers at 178-79 (Dep. of Anthony Cowan).

Q: And when Mr. Lynch contacted the Newton agency clients, he was doing so as an employee of Caledonian; is that right?

A: Correct.[4]

Newton filed suit to enforce the noncompetition agreements and obtained an order to show cause why a preliminary injunction should not be entered. Lynch was served with the order on December 23, the day he started working at Caledonian. He told Cowan about the order the same day. Contending his obligation under the noncompetition agreements had been discharged by his personal bankruptcy in 1996, Lynch removed the proceedings to bankruptcy court. Between the day Lynch received the order to show cause and the bankruptcy hearing on January 10, 2000, Lynch continued to contact Newton customers, and had them sign "Broker of Record" letters transferring their business from Newton to Caledonian. The bankruptcy court held that Lynch's noncompetition obligations were not discharged by his personal bankruptcy, and entered a preliminary injunction. Lynch nevertheless continued to contact Newton customers and transfer their business to Caledonian.

The bankruptcy court remanded to state court for further proceedings. Newton asserted claims for breach of the noncompetition agreements and tortious interference with business expectations. Lynch requested arbitration as provided by the agreements. The arbitrator determined that Lynch had wrongfully breached his noncompetition agreements, had tortiously interfered with Newton's business relationships, and had breached his fiduciary duties to Newton. The arbitrator entered an award granting Newton a permanent injunction, damages, and attorney fees. The damages were based on expert testimony establishing that the accepted method for evaluating a lost book of insurance business was to use a multiple of annual commissions. The

---

[4] Clerk's Papers at 180 (Dep. of Anthony Cowan).

arbitrator awarded $281,913.82 in damages, representing two times the lost annual commissions from 27 accounts.[5]

Newton filed a separate action against Caledonian, alleging tortious interference and civil conspiracy. The trial court granted Newton's motion for summary judgment as to both liability and damages. Caledonian appeals.

## DISCUSSION

### Standard of Review

■ ■ Summary judgment is appropriate when the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue about any material fact and, assuming facts most favorable to the nonmoving party, establish that the moving party is entitled to judgment as a matter of law.[6] In opposing summary judgment, a party may not rely merely upon allegations or self-serving statements, but must set forth specific facts showing that genuine issues of material fact exist.[7]

### Interference With a Business Expectancy

■ To prove tortious interference with a business expectancy, a plaintiff must show (1) the existence of a valid contractual relationship or business expectancy, (2) that the defendant had knowledge of that expectancy, (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy, (4) that the

---

[5] Newton has collected nothing on this award. Lynch testified in supplemental proceedings that he was insolvent, had no means of paying the judgment, and did not intend to do so.

[6] CR 56(c); *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

[7] CR 56(e); *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989); *Seybold v. Neu*, 105 Wn. App. 666, 676, 19 P.3d 1068 (2001).

defendant interfered for an improper purpose or used improper means, and (5) resulting damage.[8]

■ A valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value.[9] Newton had a valid business expectancy in all of its customers, including those it purchased from Lynch's insurance business and those serviced by him as Newton's employee.

Caledonian admits that it knew of Lynch's noncompetition agreements, and still offered Lynch a job expecting his former clients to follow him from Newton. Lynch and Caledonian therefore had knowledge of Newton's expectancy.

■ Interference with a business expectancy is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action."[10] It is undisputed that Lynch prepared and sent "Broker of Record" transfer letters to his former clients. Lynch and Caledonian both intended that Lynch's former customers would switch from Newton to Caledonian.

The first three elements of the tort are thus undisputed. Caledonian's liability for interference turns solely on whether a question of fact remains about the improper purpose element.

■ Interference is for an improper purpose if it is wrongful by some measure beyond the interference itself, such as a statute, regulation, recognized rule of common law, or an established standard of trade or profession.[11]

■■ Caledonian argues that whether Lynch's interference was improper is a question for the trier of fact:

---

[8] *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997); *Hudson v. City of Wenatchee*, 94 Wn. App. 990, 998, 974 P.2d 342 (1999).

[9] RESTATEMENT (SECOND) OF TORTS § 766B cmt. c (1979).

[10] RESTATEMENT (SECOND) OF TORTS § 766B cmt. d.

[11] *Pleas v. City of Seattle*, 112 Wn.2d 794, 804, 774 P.2d 1158 (1989) (citing *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 582 P.2d 1365, 1371 (1978)).

[A]s with negligence, when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question.[12]

Under certain circumstances, however, "identifiable standards of business ethics or recognized community customs as to acceptable conduct" have developed, such that "the determination of whether the interference was improper should be made as a matter of law, similar to negligence per se."[13] Interference with a business expectancy in violation of a contract not to compete is such a case.[14]

Caledonian contends, however, that Lynch's actions were not improper, because Lynch's personal bankruptcy attorney told Lynch and Caledonian that Lynch's agreements not to compete were potentially unenforceable because they were discharged in Lynch's personal bankruptcy. Caledonian cites no authority for the proposition that the advice of counsel, whether reasonable or not, provides a shield against liability. Here, the advice was wrong, and was at best highly tenuous. Reasonable minds could not differ as to the impropriety of Lynch's conduct.

 Lynch was undisputedly Caledonian's agent. An agency relationship exists where the principal consents to the agent's actions on the principal's behalf.[15] A principal is liable for the acts of his or her agent committed while the agent is acting within the scope of the agency.[16] It is

---

[12] RESTATEMENT (SECOND) OF TORTS § 767 cmt. l.

[13] RESTATEMENT (SECOND) OF TORTS § 767 cmt. l.

[14] See Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc., 86 Wn. App. 732, 746, 935 P.2d 628 (1997).

[15] See Dep't of Ret. Sys. v. Kralman, 73 Wn. App. 25, 29, 867 P.2d 643 (1994); RESTATEMENT (SECOND) OF AGENCY § 1 (1958).

[16] Niece v. Elmview Group Home, 131 Wn.2d 39, 48, 929 P.2d 420 (1997); Thompson v. Everett Clinic, 71 Wn. App. 548, 551, 860 P.2d 1054 (1993) (employer vicariously liable for employee's torts where "employee was acting in furtherance of the employer's business and . . . he or she was acting within the course and scope of employment when the tortious act was committed"); RESTATEMENT (SECOND) OF AGENCY §§ 144, 219.

undisputed that Lynch was acting in furtherance of Caledonian's insurance business and within the scope of his employment as vice-president of Caledonian. Caledonian is therefore vicariously liable for Lynch's interference, and no material questions of disputed fact exist on the issue of Caledonian's liability for tortious interference.

Nor do questions of fact exist as to Caledonian's liability for civil conspiracy. To establish a civil conspiracy, a plaintiff must:

> [P]rove by clear, cogent, and convincing evidence that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy.[17]

Here, it is not disputed that Caledonian and Lynch planned to divert Newton's business by ignoring the noncompetition agreement. It is also undisputed that Caledonian hired Lynch for the purpose of obtaining Lynch's former customers. The same facts that establish Caledonian's liability for tortious interference establish its liability for civil conspiracy. The trial court therefore properly granted summary judgment on Caledonian's liability for tortious interference with a business expectancy and civil conspiracy.

The remaining issue is damages. Newton contends Caledonian is precluded from challenging damages because in the proceedings below, Caledonian argued only that the economic loss rule prevented Newton from recovering, and did not dispute the amount of damages. Newton is mistaken. Anthony Cowan testified that based on his experience in the industry, it was "highly unlikely" that any of Lynch's clients "would have stayed with Newton following his departure from that agency because of the long-term relationship he had with his insurance accounts."[18] Caledonian thus presented evidence that some or all of

---

[17] *All Star Gas, Inc. v. Bechard*, 100 Wn. App. 732, 740, 998 P.2d 367 (2000).

[18] Clerk's Papers at 238.

Newton's losses were not caused by tortious interference, but were a natural result of Lynch's departure from Newton. Viewed in a light most favorable to Caledonian, the damages issue was not abandoned below.

 Whether Caledonian is bound by the arbitrator's determination of damages depends on the application of collateral estoppel, which bars relitigation of a particular issue or determinative fact.[19] The elements of collateral estoppel are:

> "(1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied."[20]

 The issues were identical, and a final judgment resulted. Caledonian was not a party, however, so the question is whether Caledonian was in privity with Lynch. Newton contends Lynch and Caledonian were in privity because Lynch acted as Caledonian's agent. "Generally, agency has been found to provide the requisite privity only when the principal or agent is attempting to benefit from collateral estoppel, not when collateral estoppel is used *against* the principal or agent."[21] The relationship between Lynch and Caledonian, however, is more than that of agent and principal; as described above, they are coconspirators. Certainly Lynch, as a party to the arbitration, is collaterally estopped from relitigating damages. As his coconspirator, Caledonian is jointly and severally liable for the damages resulting from his conduct.[22] Those damages have been established, and Newton seeks no more than that. On principles of joint and several liability, therefore, the trial

---

[19] *Hadley v. Maxwell*, 144 Wn.2d 306, 311, 27 P.3d 600 (2001).

[20] *Hadley*, 144 Wn.2d at 311 (quoting *Southcenter Joint Venture v. Nat'l Democratic Policy Comm.*, 113 Wn.2d 413, 418, 780 P.2d 1282 (1989)).

[21] *Ward v. Torjussen*, 52 Wn. App. 280, 283, 758 P.2d 1012 (1988).

[22] *Sterling Bus. Forms, Inc. v. Thorpe*, 82 Wn. App. 446, 454, 918 P.2d 531 (1996).

court properly entered judgment against Caledonian in the same amount previously ordered against Lynch.

Caledonian contends Newton can recover no damages at all, because economic losses are not recoverable in tort. Caledonian misunderstands the economic loss rule, which provides that where parties to a contract allocate risk, tort remedies are unavailable.[23] Caledonian had no contract with Newton and the rule has no application here.

Affirmed.

Cox, A.C.J., and Appelwick, J., concur.

Review granted at 148 Wn.2d 1021 (2003).

---

[23] *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 827, 881 P.2d 986 (1994).