**NOTICE:  SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| WINDCREST OWNERS ASSOCIATION, a Washington non-profit corporation, | No. 82836-3-I |
| Appellant, | DIVISION ONE |
| v. | ORDER GRANTING MOTION TO PUBLISH |
| ALLSTATE INSURANCE COMPANY, an Illinois company, | |
| Respondent, | |
| STATE FARM FIRE AND CASUALTY COMPANY, an Illinois company, | |
| Defendant. | |

Respondent Allstate Insurance Company and former Respondent[1] State

Farm Fire and Casualty Company moved for publication of the opinion filed on

December 12, 2022. Appellant Windcrest Owners Association has filed an

answer. Amicus curiae Richmond Sequoia Homeowners Association and Stein,

Sudweeks & Stein, PLLC also filed an answer to the motion. A panel of the court

has reconsidered its prior determination not to publish the opinion for the above-

---

[1] Pursuant to a stipulated motion to dismiss by Appellant and State Farm, this court dismissed State Farm from the appeal on June 21, 2022.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

entitled matter and has found that it is of precedential value and should be published. Now, therefore, it is hereby

ORDERED that the written opinion filed on December 12, 2022, shall be published and printed in the Washington Appellate Reports.

For the Court:

_Chung, J._
Judge

For the current opinion, go to https://www.lexisnexis.com/clientslawareports/.

THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| WINDCREST OWNERS ASSOCIATION, a Washington non-profit corporation<br><br>Appellant,<br><br>v.<br><br>ALLSTATE INSURANCE COMPANY, an Illinois company<br><br>Respondent,<br><br>STATE FARM FIRE AND CASUALTY COMPANY, an Illinois company,<br><br>Defendant. | No. 82836-3-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

CHUNG, J. —Windcrest Owners Association filed a lawsuit against Allstate Insurance after the company declined a claim for property damage to a building in its condominium development. Allstate moved for summary judgment, alleging that the property damage was not covered as a "collapse" and was excluded from coverage because it resulted from faulty construction and maintenance. The trial court granted summary judgment dismissing Windcrest's claims. We affirm.

FACTS

Windcrest Condominiums, which consists of 15 units in two buildings, was completed in 1995. Allstate provided a commercial property insurance policy from

No. 82836-3-I /2

November 2002 through 2017.[1]

In October 2018, Windcrest notified Allstate of a property damage claim based on a structural report prepared by Dibble Engineers. The report noted decay consistent with substantial impairment of structural integrity to one of the buildings. Specifically, it noted, "The capacity of the building's lateral- and gravity-force-resisting systems are compromised by decay that has been hidden by the exterior siding." Dibble discovered severely corroded nails and "degradation or deterioration of the OSB sheathing from a combination of bug or pest and/or water deterioration related damage to the sheathing." Dibble also described damage to wall studs based on wood rot, organic growth, and pest damage. According to Dibble, moisture from outside entered through the building cladding, penetrated the wood of the studs and sheathing, causing rot and decay which led to bug infestation.

Allstate retained construction consultants from Madsen, Kneppers & Associates, Inc. (MKA) to conduct an inspection and evaluation of causation of the damage at Windcrest. MKA concluded that there were sites of noted decay of structural components but no evidence of collapse "defined as an abrupt falling down or caving in," as required for coverage by Allstate's policy. Allstate denied Windcrest's claim on August 5, 2019.

Windcrest filed suit against Allstate, alleging breach of contract and bad faith under the Consumer Protection Act (CPA), Chapter 19.86 RCW.[2] Allstate moved for

---

[1] Windcrest was covered under a Customizer Policy from 2002-2013, and a Business Package Policy from 2013-2017.

[2] Windcrest also sued State Farm Fire and Casualty Insurance, but later settled and dismissed those claims. Stipulated Motion to Dismiss, 6/16/22.

summary judgment; the trial court granted the motion and dismissed the claims with prejudice.

Windcrest appeals.[3]

## ANALYSIS

The trial court dismissed Windcrest's claims against Allstate on summary judgment. We review orders on summary judgment de novo. Kim v. Lakeside Adult Family Home, 185 Wn.2d 532, 547, 374 P.3d 121 (2016). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998) (citing CR 56(c)). We consider the evidence and reasonable inferences in the light most favorable to the nonmoving party. Kim, 185 Wn.2d at 547. To defeat summary judgment, the opposing party must set forth specific facts showing a genuine issue of material fact and may not rely on allegations or self-serving statements. Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc., 114 Wn. App. 151, 157, 52 P.3d 30 (2002).

Property insurance policies generally are one of two kinds: "named-peril" policies, which provide coverage only for specific enumerated risks and exclude all other risks, or "all-risk" policies, which provide coverage for all risks unless the specific risk is excluded. Vision One, LLC v. Philadelphia Indem. Ins. Co., 174 Wn.2d 501, 513, 276 P.3d 300 (2012). "Determining whether coverage exists is a 2-step process. The insured must show the loss falls within the scope of the policy's insured losses. To avoid

---

[3] Although Windcrest assigned error to the trial court's grant of summary judgment, neither its briefing at summary judgment nor on appeal addressed the CPA claims. Where an assignment of error is not argued in the briefing, we assume it is abandoned and will not consider it on appeal. Cummings v. Nordmark, 73 Wn.2d 322, 324, 438 P.2d 605 (1968).

coverage, the insurer must then show the loss is excluded by specific policy language."

McDonald v. State Farm Fire & Cas. Co., 119 Wn.2d 724, 731, 837 P.2d 1000 (1992).

An insured has the burden of proving that coverage is triggered, while the insurer has

the burden of proving that an exclusion applies. Feenix Parkside LLC v. Berkley N.

Pac., 8 Wn. App. 2d 381, 387, 438 P.3d 597 (2019).

Interpretation of an insurance policy is a question of law reviewed de novo.

Vision One, 174 Wn.2d at 512. Courts construe insurance policies as the average

person purchasing insurance would and give the language "a fair, reasonable, and

sensible construction." Vision One, 174 Wn.2d at 512 (quoting Key Tronic Corp. v.

Aetna (CIGNA) Fire Underwriters Ins. Co., 124 Wn.2d 618, 627, 881 P.2d 201 (1994)).

When a term is undefined, we assign its ordinary meaning as provided in standard

English language dictionaries. Overton v. Consolidated Ins. Co., 145 Wn.2d 417, 428,

38 P.3d 322 (2002). Ambiguities in the policy and exclusions from coverage are

construed against the drafter-insurer. Vision One, 174 Wn.2d at 512.

I.      Collapse Coverage

Windcrest made a claim under the Allstate insurance policy. The all-risk policy at

issue insures "loss or damage resulting from direct physical loss" except for enumerated

exclusions. As one of those exclusions, Allstate does not cover any loss or damages

caused by collapse except as provided under additional collapse coverage. Windcrest's

insurance policy included this collapse coverage:

> D. Additional Coverage - Collapse
>
> The coverage provided under this Additional Coverage Collapse
> applies only to an abrupt collapse as described and limited in D.1
> through D.7.

1. For the purpose of this Additional Coverage - Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if the collapse is caused by one or more of the following:

   a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

   b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

   c. Use of defective material or method in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

   d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

      (1) A cause of loss listed in 2.a or 2.b;

      (2) One or more of the "specified causes of loss…"

The policy then limits the collapse coverage, stating as follows:

3. This Additional Coverage – Collapse does not apply to:

   a. A building or any part of a building that is in danger of falling down or caving in;

   b. A part of a building that is standing, even if it has separated from another part of a building;

   c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

Finally, the Allstate policy defines "collapse" as follows:

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

With respect to buildings:

a. Collapse means an abrupt falling down or caving in of a building, or any part of a building, with the result that the building or part of a building cannot be occupied for its intended purpose;

b. A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

Windcrest contends that the collapse provisions of the policies apply because "building components have collapsed and are no longer taking up or filling the space they were intended for," and "were no longer able to support their intended purpose." Allstate argues that the slow deterioration of parts of the building does not fit within the policy definition of "collapse."

To interpret the provisions on collapse coverage we may use the dictionary definition and "a fair, reasonable, and sensible construction" of the policy language. Vision One, 174 Wn.2d at 512. The dictionary defines "abrupt" as "broken off: suddenly terminating as if cut or broken off" or "characterized by or producing the effect of a sharp break or sudden ending." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 6 (2002). Here, the key word in the dictionary definition is "sudden." Therefore, the Allstate policy provides coverage when a building or part of a building suddenly falls down or caves in. Using this definition, the evidence does not create a question of material fact as to whether the damage meets the policy criteria for coverage.

Windcrest relies on evidence produced by its expert, Robb Dibble. Windcrest submitted Dibble's structural report to prove collapse during the coverage periods. The report states:

In our professional opinion, collapse of a building includes a building in a state of Substantial Impairment of Structural Integrity (SISI). SISI is defined as a building or part of a building that is unsafe or unfit for its

6

No. 82836-3-I /7

function. There are conditions on Building A that include portions of the wall studs, sheathing, and cladding that are unable and unfit to serve their intended function. These components are important as structural elements of the building that in their current state are unfit for their ability to serve their intended use and are in a state of collapse.

This definition of collapse differs significantly from the insurance policy's definition. Dibble defines collapse as "Substantial Impairment of Structural Integrity (SISI)," which exists when "a building or part of a building [] is unsafe or unfit for its function." SISI does not include either suddenness or falling down or caving as necessary to meet the policy definitions. Windcrest cannot rely on Dibble's definition of collapse; the controlling definition is the one provided by the insurance policy. See Overton 145 Wn.2d at 427 ("Courts interpreting insurance policies should be bound by definitions provided therein.").

Dibble's deposition testimony about the timeline for the damage also fails to establish the requisite suddenness and, in fact, supports the opposite conclusion:

Q. Let me ask you this. Can you say when the elements that are not there actually fell down or collapsed abruptly, caved in. The question is when that happened?

A. And I like to use a wide range. I don't hit one-year targets or two-year targets; I hit bigger windows. It didn't get like that in the last five years; it didn't get that like in the first five years. So we can narrow that 25-year window down to more -- on a more probable than not basis, those middle 15 years.

In Dibble's assessment, the collapse occurred over a prolonged period of time of approximately 15 years. However, he could not point to any evidence of an abrupt falling down.

Subsequently, Dibble provided a declaration containing a conflicting statement that a "portion of framing actually fell down or into pieces. These

7

components all provide structural support to the building. The actual collapse of building components would have been sudden." To the extent Dibble's declaration contradicts his deposition testimony about the slow timeframe for collapse, it cannot create a material issue of fact to defeat summary judgment. " 'When a party has given clear answers to unambiguous [deposition] questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.' "[4] Marshall v. AC & S Inc., 56 Wn. App. 181, 185, 782 P.2d 1107 (1989) (quoting Van T. Junkins & Assocs., Inc. v. United States Indus., Inc., 736 F.2d 656, 657 (11th Cir.1984)). Moreover, Dibble makes this statement without any evidence or explanation. A conclusory expert opinion, or one based on assumptions, cannot satisfy summary judgment standards. Doe v. Puget Sound Blood Center, 117 Wn.2d 772, 787, 819 P.2d 370 (1991).

In addition to the lack of suddenness, Windcrest has failed to provide evidence that the building or parts of the building fell down, fell to pieces, or caved in. In his deposition, Dibble stated that parts of the structure, specifically, the OSB sheathing, had degraded and fallen off and the "wood members" were "caving in and collapsing on themselves." According to Dibble, other than wood fibers at a cellular level that abruptly fell down or caved in, the evidence of collapse in photos was "the pieces that aren't

---

[4] This is known as the "sham affidavit" doctrine. Behr v. Anderson, 18 Wn. App. 2d 341, 364, 491 P.3d 189 (2021). "Although the rule is typically applied where a party submits an affidavit that contradicts the party's own prior statements, it may also apply when a party attempts to use evidence from an expert to defeat summary judgment." Id. The rule is narrowly applied such that the challenged affidavit must directly contradict the affiant's unambiguous sworn testimony. Id. at 365.

there anymore" and "[w]hat's missing is what's collapsed and fallen off the building . . . not what's there, it's what's not there." But the record lacks any evidence of pieces of the building that had fallen or caved in.

Moreover, the MKA study noted that there was damage to the buildings but "there is no evidence to indicate that any parts of the building are currently . . . in a state of collapse as defined as an abrupt falling down or caving in." Indeed, a Windcrest resident and board member confirmed that no part of the building had caved in or abruptly fallen down. Dibble also acknowledged that neither the roof nor any part of the walls had fallen down or caved in. Dibble's characterization of deteriorating internal structure as "collapse of building components" does not equate to the falling down or caving in that is necessary for the policy definitions of collapse. He did not identify any parts of a building that had fallen down, pointing instead to "[w]hat's missing" as evidence of collapse. The policy explicitly states that even "danger of falling down or caving in is not considered to be in a state of collapse." Dibble's testimony is insufficient to prove the sudden falling down needed to prove actual collapse as defined by the Allstate policies—and the policy, not the expert's own definition, is controlling.

Finally, the Allstate policy requires that "the building or part of a building cannot be occupied for its intended purpose." Windcrest attempts to distinguish "occupied" from "habitable," arguing that "building components are no longer taking up or filling the space they were intended for" and are, therefore, no longer occupied for their intended purpose.

There are several dictionary definitions for "occupy," including "to fill up" and "to reside in as an owner or tenant." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1561

(2002). While "to fill up" is consistent with Windcrest's construction of the insurance policy language, we must construe the policy as an average person purchasing insurance would. See Vision One, 174 Wn.2d at 512. When referring to a residential building, such as the condominium in this case, an average person would interpret "a part of a building cannot be occupied" to mean a portion of a building that cannot be "reside[d] in," not a component part of a building, such as "OSB sheathing, WRB, and portions of framing," that no longer fills up the space it once did. Therefore, the collapse policy requires that the building, or parts of the building, cannot be "resided in" or habitable.

Windcrest has not produced evidence that the structures are no longer habitable. Indeed, a Windcrest resident and board member confirmed that Dibble never informed the board that the buildings were unsafe or unfit to occupy. The Windcrest buildings have not collapsed such that they can no longer be occupied for their intended purpose.

Windcrest has not demonstrated a collapse as defined by the Allstate insurance policy. The collapse coverage does not apply.

II.      Policy Exclusions

As an alternative basis for coverage, Windcrest claims the loss is not otherwise excluded from coverage. In an all-risk policy, " 'any peril that is not specifically excluded in the policy is an insured peril.' " Vision One, 174 Wn.2d at 513 (quoting Findlay v. United Pac. Ins. Co., 129 Wn.2d 368, 378, 917 P.2d 116 (1996)). Windcrest claims that damage short of a state of collapse was caused by weather—specifically, wind-driven rain—and is not excluded from coverage under the Allstate policy. Allstate contends the

No. 82836-3-I /11

damage is not covered because the initiating cause—inadequate construction, repair, and maintenance—is excluded under the terms of the policy.

"[W]hen two or more perils combine in sequence to cause a loss, and a covered peril is the predominant or efficient cause of the loss," the "efficient proximate cause" rule mandates coverage, "even if an excluded event appears in the chain of causation that ultimately produces the loss." Vision One, 174 Wn.2d at 519 (citations omitted). "Stated in another fashion, where an insured risk itself sets into operation a chain of causation in which the last step may have been an excepted risk, the excepted risk will not defeat recovery." Villella v. Pub. Emps. Mut. Ins. Co., 106 Wn.2d 806, 808, 725 P.2d 957 (1986), quoted in Hill & Stout, PLLC v. Mut. of Enumclaw Ins. Co., 200 Wn.2d 208, 226, 515 P.3d 525, 535 (2022). This rule imposes liability on the insurer for loss caused by the covered peril, even though excluded perils contributed to the loss. Sunbreaker Condo. Ass'n v. Travelers Ins. Co., 79 Wn. App. 368, 375, 901 P.2d 1079.

On the other hand, " '[w]hen an excluded peril sets in motion a causal chain that includes covered perils, the efficient proximate cause rule does not mandate exclusion of the loss.' " Hill & Stout, 200 Wn.2d at 226 (quoting Vision One, 174 Wn.2d at 519) (emphasis in original). But an insurer may draft policy language to exclude coverage when "an excluded peril initiates an unbroken causal chain." Vision One, 174 Wn.2d at 519.

The Allstate policy at issue in this case includes this type of policy language excluding coverage when an excluded peril is the initiating cause of the loss:

> We will not pay for loss or damage caused by any of the excluded events described below. Loss or damage will be considered to have been caused by an excluded event if the occurrence of that event:

11

No. 82836-3-I /12

     a.   Directly and solely results in loss or damage; or

     b.   Initiates a sequence of events that results in loss or damage, regardless of the nature of any intermediate or final event in that sequence.[5]

This language is identical to language in the policy at issue in <u>Hill & Stout</u>. There, the Court analyzed this language, stating

> This exclusionary language thus appears to contract with the efficient proximate cause in mind, excluding coverage when an exclusion is the only cause of loss or initiates the chain of causation of the loss. And we have left open that insurers can contract to say that coverage is excluded for a causal chain initiated by an excluded peril. The exclusionary language in the policy does just that.

<u>Hill & Stout</u>, 200 Wn.2d at 228-29. Likewise, the language in the Allstate policy excludes coverage for a causal chain initiated by an excluded peril. The policy specifically excludes faulty construction as well as maintenance:

> 3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
> . . .
>
> c. Faulty, inadequate or defective:
> (1)    Planning, zoning, development, surveying, siting;
> (2)    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
> (3)    Materials used in repair, construction, renovation or remodeling; or
> (4)    Maintenance; of part or all of any property on or off the described premises.

Based on this exclusion, Allstate argues that the loss is not covered.

---

[5] (Amendatory Endorsement for Customizer Policies (Washington))

Windcrest claims the damage was caused by wind-driven rain. Windcrest argues that because the weather exclusion does not include wind-driven rain, damage from wind-driven rain is therefore covered by the all-risk policy.

Regardless of whether damage from wind-driven rain is covered, given that the policy excludes coverage for a causal chain initiated by an excluded peril, there is a question as to causation. Typically, the determination of the efficient proximate cause of loss is a question of fact for the fact finder. Hill & Stout, 200 Wn.2d at 227. However, "when the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion … it may be a question of law for the court." Graham v. Pub. Emps. Mut. Ins. Co., 98 Wn.2d 533, 539, 656 P.2d 1077 (1983), quoted in Hill & Stout, 200 Wn.2d at 227.

Here, the evidence from both Allstate and Windcrest demonstrates that defective construction and maintenance initiated the chain of causation resulting in the loss. Even assuming losses resulting from wind-driven rain are covered, the evidence creates no factual questions as to the sequence of events that caused the loss: the faulty construction and maintenance created a pathway for water to enter. Allstate submitted both a report and deposition testimony from expert David VanDerostyne to support a coverage exclusion due to defective construction. The report stated conclusively that decay and deterioration occurred over an extended number of years due to "defective original construction in combination with lack of repairs and/or maintenance." Similarly, deposition testimony clearly established defective construction as the cause. VanDerostyne definitively stated, "What caused this was the combination of inadequate

13

construction and poor maintenance." In response to further questions, the expert

elaborated:

> Q. So I just want to clarify. When I asked you what the cause of that
> damage was, you said inadequate construction and maintenance. How
> does inadequate construction and maintenance cause that damage
> without water?
> A. Because it allows the water to get in – to get into an envelope system
> that that is -- the purpose of it was to prevent water from getting into the
> building. So ...
> Q. So when I asked what caused this damage that we're looking at, is it
> fair to say inadequate construction, maintenance, and water?
> A. Like I said, the inadequate construction and maintenance allowed the
> water to get into the building.

Additionally, the expert explained, "This damage is decay of the wood caused by

inadequate maintenance and inadequate construction."

During his deposition, Windcrest's expert Dibble likewise acknowledged the role

of poor construction and maintenance in structural damage. He stated that "[w]ell

constructed buildings should not leak." Dibble agreed that "if the building was properly

constructed, designed and maintained, the building should not have damage from water

intrusion."

To rebut this evidence from both Allstate's and Windcrest's experts, Windcrest

relied on Dibble's subsequent declaration:

> This property damage was caused by weather conditions, including wind-
> driven rain. The damage observed at Windcrest would not have occurred
> but for the weather conditions . . . Each rain event would have caused new
> and additional property damage.

However, as discussed above, Dibble's declaration consists merely of conclusions that

contradict his unambiguous sworn testimony, and therefore, cannot raise an issue of

material fact to defeat summary judgment. See Behr, 18 Wn. App. 2d at 365.

14

Windcrest does not allege that wind-driven rain independently initiated or caused the loss.[6] Windcrest's own expert agreed that had the building been properly constructed and maintained, there would be no damage from water intrusion. Thus, the loss was excluded from coverage as the defective construction and maintenance were excluded and were the only independent cause for the water damage.

III.     Ensuing Loss

Finally, Windcrest claims the loss is covered under the "ensuing loss" provision. An ensuing loss clause "operates to carve out an exception to the policy exclusion." Vision One, 174 Wn.2d at 514. Ensuing loss clauses limit the scope of exclusions, ensuring "that if one of the specified uncovered events takes place, any ensuing loss which is otherwise covered by the policy will remain covered." McDonald, 119 Wn.2d at 734. "[T]he clause breaks the causal chain between the excluded risk and losses caused by the excluded peril in order to provide coverage for the subsequent losses." Sprague v. Safeco Ins. Co. of Am., 174 Wn.2d 524, 529, 276 P.3d 1270 (2012). Generally, "[e]nsuing loss provisions are exceptions to policy exclusions and should not be interpreted to create coverage." Wright v. Safeco Ins. Co. of Am., 124 Wn. App. 263,

---

[6] In a factually similar case involving water damage to a building that was initiated by faulty construction and maintenance, the court found no question of fact as to causation, reasoning

> [The condo association] does not allege, for example, that wind-driven rain occurred during construction and deposited water on the framing or sheathing in quantities sufficient to initiate the sequence of events that ultimately resulted in the observed water damage. Likewise, [it] does not allege, and the evidence does not support, that wind-driven rain itself damaged the Building's weather-resistant system, thereby creating pathways for the water to intrude. Rather, [the condo association's] own expert opines that construction defects created pathways that allowed water to penetrate the weather-resistant barrier and damage underlying building components over a period of time.

Corliss Condo. Owners Ass'n v. Nat'l Surety Corp., ___ F. Supp. 3d ___, 2022 WL 4448547 at *4 (W.D. Wash. 2022).

15

274, 109 P.3d 1 (2004).  "Ensuing loss clauses may not cover losses that are otherwise excluded." Vision One, 174 Wn.2d at 515.

Here, the ensuing loss provision in the Allstate policy states, "But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a 'specified cause of loss', building glass breakage, or collapse, as provided in the Additional Coverage – Collapse, we will pay for the loss or damage caused by that 'specified cause of loss', building glass breakage or collapse."[7]

Windcrest alleges this provision applies because an excluded peril resulted in collapse. As discussed above, Windcrest has not demonstrated collapse; therefore, the ensuing loss provision does not apply to establish coverage for collapse.

The ensuing loss provision also excludes coverage for "specified causes of loss." This policy defines this as follows:

> 2. "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

The policy then specifically defines "water damage":

> c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

---

[7] Excluded causes of loss listed in 2.d.(1) through (7) include (1) wear and tear; (2) rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself; (3) smog; (4) settling, cracking, shrinking or expansion; (5) nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals; (6) mechanical breakdown; (7) causes of loss to personal property including dampness or dryness of atmosphere, change in or extreme temperature, marring and scratching.

16

Windcrest does not allege water damage that meets this definition. Therefore, the ensuing loss provision does not cover the loss.

CONCLUSION

The evidence shows no abrupt or sudden falling down of any part of a building such that it could not be occupied for its intended purpose, so the policy coverage for collapse does not apply. Based on the evidence properly before the trial court, the damage to the condominium originated with faulty construction and maintenance. The Allstate policy explicitly excludes coverage for faulty construction and maintenance, as well as for any loss initiated by those excluded perils. Finally, the loss is not covered by the ensuing loss provision. Therefore, Windcrest's loss is excluded from policy coverage. The trial court properly granted summary judgment for Allstate and dismissed Windcrest's claims.

Affirmed.

_Chung, J._

WE CONCUR:

_Bremner, J_        _Andrus, C.J._